UNITED STATES BANKRUPTCY COURT        Not for Publication
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| WORLDCOM, INC., *et al.*, | : | Case No. 02-13533 (AJG) |
|  | : | (Jointly Administered) |
| Debtors. | : | (Confirmed) |
|  | : |  |

-------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| MCI WORLDCOM COMMUNICATIONS, INC., | : |  |
| f/k/a WORLDCOM TECHNOLOGIES, INC., | : |  |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : | Adv. Proc. No. 04-04338 (AJG) |
|  | : |  |
| COMMUNICATIONS NETWORK | : |  |
| INTERNATIONAL, LTD., | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

-------------------------------------------------------------------x

**OPINION (i) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS, (ii) GRANTING DEFENDANT'S MOTION TO FILE NUNC PRO TUNC RESPONSES TO CERTAIN PARAGRAPHS OF THE COMPLAINT, AND (iii) DENYING DEFENDANT'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS**

A P P E A R A N C E S :

STINSON MORRISON HECKER LLP
Attorney for Plaintiff
1201 Walnut Street
Kansas City, MO 64106

> Jodi M. Hoss, Esq.
> Mark A. Shaiken, Esq.
> W. Dennis Cross, Esq.
>     Of Counsel

FLAMM, BOROFF & BACINE, P.C.
Attorney for Defendant

794 Penllyn Pike
Blue Bell, PA 19422

> Howard Gershman, Esq.
> W. Mark Mullineaux, Esq.
> Of Counsel

ARTHUR J. GONZALEZ
United States Bankruptcy Judge

In an adversary proceeding between MCI WorldCom Communications, Inc., ("MCI," "WorldCom," "Debtors," or "Plaintiff") and Communications Network International, Ltd., ("CNI" or "Defendant"), the Court must make a decision on the following motions: (i) MCI's Motion for Judgment on the Pleadings, pursuant to Federal Rule of Civil Procedure 12(c), which is applicable to this proceeding through Federal Rule of Bankruptcy Procedure 7012(b); (ii) CNI's Motion to File Responses *Nunc Pro Tunc* to Certain Paragraphs of the Complaint; (iii) CNI's Cross-Motion for Judgment on the Pleadings, which requests the Court to enter judgment on the pleadings in favor of CNI if the Court denies CNI's motion to file responses.

MCI's motion is granted in part and denied in part. CNI's motion to file responses is granted and the Court therefore denies CNI's cross-motion.

## JURISDICTION

The Court has subject matter jurisdiction over this proceeding pursuant to sections 1334 and 157(b) of title 28 of the United States Code, under the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.), and under paragraph 32 of this Court's Order Confirming Debtors' Modified Second Amended Joint Plan of Reorganization under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") (Oct. 31, 2003). This proceeding

is a core proceeding under 28 U.S.C. § 157(b).  Venue is properly before this Court pursuant to

section 1409(a) of title 28 of the United States Code.

## FACTS

### *Background Information About the Debtors*

On July 21, 2002 and November 8, 2002, WorldCom, Inc., and certain of its direct and

indirect subsidiaries commenced cases under the Bankruptcy Code.  By orders dated July 22,

2002 and November 12, 2002, the Debtors' chapter 11 cases were consolidated for procedural

purposes.  During the chapter 11 cases, the Debtors operated their businesses and managed their

properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.

By order dated October 29, 2002, this Court established January 23, 2003 as the deadline

for the filing of a proof of claim against the Debtors.  By order dated October 31, 2003, the Court

confirmed the Debtors' Modified Second Amended Joint Plan of Reorganization, which became

effective on April 20, 2004.  Upon this effective date, the Debtors became MCI, Inc.  Verizon

Communications, Inc., and MCI, Inc., merged on January 6, 2006.

### *Business Relationship and Litigation Between MCI and CNI*[1]

CNI resells to its own customers telecommunications services from common carriers like

WorldCom.  In 1997, CNI was tariffed to provide telecommunications services in New Jersey

and Pennsylvania and a reseller for Network Long Distance, a long distance carrier, in New

Jersey and Pennsylvania.  For all other states, CNI was an agent for Network Long Distance

allowed to solicit telecommunications customers in states other than New Jersey or

Pennsylvania.

---

[1] For purposes of MCI's motion for judgment on the pleadings, the Court assumes that CNI's factual allegations are true.  *De Rosa v. Jacone (In re Jacone)*, 156 B.R. 740, 743 (Bankr. S.D.N.Y. 1993).

3

CNI alleges that in December 1997 WorldCom and CNI entered into a verbal agreement, which, according to CNI, provided that (a) CNI would be a WorldCom reseller and agent, (b) CNI could use WorldCom's tariffs in all states to provide services, (c) CNI would bring its "book of business" to the relationship, (d) WorldCom would provision[2] CNI's customers so that WorldCom would provide long distance services to CNI's customers, and (e) WorldCom would bill CNI at $0.09 per minute but that cost would be reduced by a 5.3% rebate from WorldCom through a company called Retex, leaving an effective rate of about $0.085 per minute. Also in December 1997, WorldCom and CNI entered into a written "Intelenet Agreement," which, according to CNI, was eventually deemed inappropriate for the parties' relationship by WorldCom.

CNI built its customer base using WorldCom's tariffs in 42 states and WorldCom received income from this business. On February 13, 1998, WorldCom confirmed in writing that WorldCom was tariffed in all 50 states, which would allow CNI to add all locations in the United States under the "CNI umbrella." Answer of Communications Network International, Ltd., with Affirmative Defenses to Both Claim Objection and Adversary Proceeding, Ex. A ¶ 13. CNI claims that WorldCom, however, told Vermont state officials that CNI was not authorized to use WorldCom's tariffs. WorldCom admits making such a statement. Claim Objection and Adversary Proceeding, Ex. A ¶ 13.

In mid-1998, WorldCom sales people told CNI that WorldCom had failed to treat CNI as a reseller but instead improperly had treated CNI as an end user. They admitted to CNI that WorldCom had to eliminate the problems that WorldCom was having with provisioning, billing and credits because in these areas WorldCom was causing problems to CNI. WorldCom also

---

[2] "Provisioning" means providing telecommunications services to a customer.

4

pushed CNI to sign a rebiller[3] agreement and promised to CNI that with such an agreement in place WorldCom would eliminate problems regarding provisioning, billing and credits. WorldCom also promised that, under a rebiller agreement, WorldCom would continue to allow CNI to use WorldCom's certificates in 50 states.

In November 1998, CNI gave to WorldCom a rebiller agreement, the "WorldCom Rebiller Service Agreement," signed by CNI but not WorldCom. WorldCom gave a copy of the Rebiller Agreement signed by both parties to CNI on January 29, 1999. The Rebiller Agreement provided that it was "offered for fifteen (15) days from November 10, 1998."

On January 29, 1999, CNI signed an amendment to the Rebiller Agreement. WorldCom signed this amendment on February 4, 1999.

WorldCom alleges that, on or about March 1, 1999, CNI gave WorldCom a check for $20,000, which was dishonored and returned because of insufficient funds. WorldCom also claims that, on or about April 15, 1999, it received a $20,000 payment from CNI. A day later, WorldCom says, CNI remitted a check to WorldCom for $66,398.45, which was dishonored and returned because of insufficient funds.

CNI alleges that in mid-1999 WorldCom, without notice to CNI's customers, shut off service to them because of CNI's failure to pay. WorldCom also terminated service to CNI itself because of nonpayment.

On February 14, 2001, WorldCom filed suit against CNI in the United States District Court for the Eastern District of Pennsylvania to recover unpaid amounts for telecommunications services ("the Pennsylvania Action"). WorldCom based its claims on theories of contract, negotiable instrument, *quantum meruit* and unjust enrichment. CNI answered only the contract

---

[3] The words "rebiller" and "reseller" are synonymous.

5

count and counterclaimed for fraud, intentional nondisclosure, breach of contract, defamation, and punitive damages. WorldCom moved to dismiss CNI's counterclaims, arguing, *inter alia,* that most of them were barred by the filed-rate doctrine. In August 2001, the District Court, pursuant to the doctrine of primary jurisdiction, denied the motion, stayed the Pennsylvania Action, and referred it to the Federal Communications Commission ("FCC"). Neither party, however, pursued the matter with the FCC. In May 2002, CNI moved to lift the stay on the district court case. The motion was granted and the Pennsylvania Action resumed until WorldCom filed for bankruptcy.

CNI filed a timely proof of claim, reasserting the counterclaims that CNI had filed in the Pennsylvania Action. WorldCom objected to the claim and initiated an adversary proceeding against CNI, reasserting the complaint that WorldCom had filed in the Pennsylvania Action. CNI filed an answer, again only responding to the contract count of the complaint. WorldCom moved for judgment on the pleadings dismissing all of CNI's claims and in favor of WorldCom on the issue of CNI's liability. CNI moved to file responses *nunc pro tunc* to the negotiable instrument, *quantum meruit*, and unjust enrichment counts of the complaint. CNI also filed a cross-motion for judgment on the pleadings if the Court denied the motion to file responses. The parties waived oral argument. *MCI WorldCom Commc'ns, Inc. v. Commc'ns Network Int'l, Inc.*, No. 04-04338 (S.D.N.Y. April 7, 2005) (Second Agreed Amended Scheduling Order).

## DISCUSSION

### *Standard under Rule 12(c)*

Standards are identical for a Rule 12(c) motion for judgment on the pleadings and a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Narvarte v. Chase Manhattan Bank*, 969 F. Supp. 10, 11 (S.D.N.Y. 1997). Judgment on the pleadings is granted if it appears beyond

6

doubt that the nonmoving party can prove no set of facts in support of its claims that would entitle it to relief. *Sheppard v. Beerman*, 94 F.3d 823, 827 (2d Cir. 1996). For the purpose of a motion on the pleadings, well-pleaded material allegations of the opposing party's pleadings are to be taken as true and all inferences are to be taken in favor of the nonmoving party. *De Rosa v. Jacone (In re Jacone)*, 156 B.R. 740, 743 (Bankr. S.D.N.Y. 1993).

In deciding a motion for judgment on the pleadings, a court may consider the pleadings and exhibits attached thereto, statements or documents incorporated by reference in the pleadings, matters subject to judicial notice, and documents submitted by the moving party, so long as such documents either are in the possession of the party opposing the motion or were relied upon by that party in its pleadings. *Prentice v. Apfel*, 11 F. Supp. 2d 420, 424 (S.D.N.Y. 1998). Tariffs are public documents of which a court may take judicial notice. *Lipton v. MCI WorldCom, Inc.*, 135 F. Supp. 2d 182, 186 (D.D.C. 2001).

### Parties' Contentions

WorldCom argues that its tariffs filed with the FCC are controlling, and therefore the filed-rate doctrine bars CNI's fraud, intentional nondisclosure, contract, and punitive damages claims. WorldCom further argues that the parties' written agreements, namely the Intelenet Agreement and the WorldCom Rebiller Service Agreement, supersede the oral agreement alleged by CNI. As for CNI's defamation claim, WorldCom asserts it is barred by the statute of limitations. If the statute does not bar the claim, WorldCom argues that CNI did not allege which specific statements constitute defamation and that the claim therefore fails as a matter of law.

In response, CNI claims that it consented to the alleged oral agreement and the Intelenet Agreement because of WorldCom's misrepresenting that (a) CNI would be a reseller and agent

7

for WorldCom, (b) CNI could use WorldCom's tariffs in all of the 50 states, (c) WorldCom could provision CNI's customers in all 50 states, and (d) CNI could have the same arrangement on services and certifications that it had with Network Long Distance. CNI claims that WorldCom knew that these representations were false.

CNI asserts that, after entering into the alleged oral and Intelenet agreements, WorldCom engaged into a pattern of intentional omissions, breaches of contract, and defamatory statements about CNI. WorldCom's conduct allegedly caused the end of CNI's business, resulting in losses in the millions of dollars. First, CNI alleges that WorldCom did not timely provision the service for its customers causing CNI to lose business. Second, CNI claims that WorldCom's billing was incorrect. Additionally, CNI alleges that WorldCom did not cooperate in providing the necessary information to allow CNI to bill its customers. For instance, CNI says that WorldCom declined CNI's request to have WorldCom's name placed on CNI's bills although, according to CNI, a change in federal law required the name of the long distance carrier to be disclosed on customer bills. Finally, CNI says that WorldCom improperly terminated services to CNI's customers and then "slammed"[4] its customers.

CNI argues that the filed-rate doctrine does not apply anymore after the FCC detariffing orders. Further, CNI asserts that, if the FCC detariffing orders have not ended the doctrine, the tariffs do not apply to CNI because they apply only to customers, not resellers.

Alternatively, CNI contends that the filed-rate doctrine does not bar its claims because they are not inconsistent with WorldCom's tariffs. CNI notes that ambiguities in a tariff should be construed against the drafter. *Theodore Allen Commc'ns, Inc. v. MCI Telecomm. Corp.*, 12 F.C.C.R. 6623, 6633 (1997) ("However, if there is ambiguity in tariffs they should be construed

---

[4] "Slamming" is the unauthorized change of a customer's telecommunications service.

8

against the framer and favorably to users…").  As to its fraud and intentional nondisclosure

claims, CNI argues that these claims refer to misrepresentations occurring prior to any agreement

and prior to the applicability of any tariff.  CNI deems that the other counts, breach of contract

and defamation, do not contradict the tariff either.

CNI further argues that the Intelenet Agreement cannot supersede the oral agreement

because the Intelenet Agreement precedes the oral agreement[5] and because the Intelenet

Agreement does not deal with reselling issues.  As for the WorldCom Rebiller Service

Agreement, CNI considers it unenforceable because WorldCom gave a copy of this Rebiller

Agreement signed by both parties to CNI after the expiration of the offer period.

*Filed-Rate Doctrine*

**Applicability**

The leading case regarding the filed-rate doctrine in the telecommunications field is

*American Telephone and Telegraph Company v. Central Office Telephone, Inc.*, 524 U.S. 214

(1998).  There has been some debate about the continued relevance of the filed-rate doctrine after

the FCC's detariffing orders, which required carriers to withdraw their tariffs by July 31, 2001.

*See Policy and Rules Concerning the Interstate, Interexchange Marketplace, Implementation of*

*Section 254(g) of the Communications Act of 1934,* as amended, Second Report and Order, 11

F.C.C.R. 20730 (1996); *Domestic, Interexchange Carrier Detariffing Order Takes Effect;*

*Common Carrier Bureau Implements Nine-Month Transition Period; Comment Sought on*

*Modifications to Transition Plan,* Public Notice, 16 F.C.C.R. 3688 (2000); *Common Carrier*

*Bureau Extends Transition Period for Detariffing Consumer Long Distance Services,* Public

---

[5] CNI's statements seem to contradict themselves on this point, saying on the one hand that the oral agreement preceded any written agreement, *see* CNI's Answer and Counterclaims ¶¶ 7-9, and on the other hand that the oral agreement came after the Intelenet Agreement, but before the Rebiller Agreement, *see* Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings 19.

Notice, 16 F.C.C.R. 2906 (2001).  The view prevails, however, that the filed-rate doctrine still

applies until the United States Supreme Court or Congress expressly reject it.  *See* Jim Rossi,

*Lowering the Filed Tariff Shield: Judicial Enforcement for a Deregulatory Era*, 56 Vand. L.

Rev. 1591, 1629-1636 (2003); Charles H. Helein et al., *Detariffing and the Death of the Filed-*

*Rate Doctrine: Deregulating in the "Self" Interest*, 54 Fed. Comm. L.J. 281 *passim* (2002).

Moreover, this Court is bound by Second Circuit precedent, which held that the FCC

unsuccessfully tried to regulate the doctrine out of existence and that therefore the doctrine still

applies.  *Fax Telecommunicaciones, Inc. v. AT&T*, 138 F.3d 479, 491 (2d Cir. 1998); *In re*

*WorldCom, Inc.*, 322 B.R. 530, 536 (Bankr. S.D.N.Y. 2005) (applying *Central Office* and *Fax*

*Telecommunicaciones*).  The Court also notes that the events giving rise to the present

controversy occurred before the detariffing orders took effect.  *See, e.g., Weinberg v. Sprint*

*Corp.*, 173 N.J. 233, 242 n.2 (2002).  Thus, the filed-rate doctrine applies to the instant

proceeding.

**Substance of the Filed-Rate Doctrine**

The filed-rate doctrine, also called the filed-tariff doctrine, is central to regulation of

interstate telecommunications carriers.  *Fax*, 138 F.3d at 488.  Two policies justify the doctrine:

prevention of discrimination between customers and preservation of the exclusive role of federal

agencies in approving rates.  *Id.* at 489.  The doctrine prevents a regulated carrier from charging

rates at variance with its tariffs filed with the FCC.  *Id.*  at 488.  The customer's ignorance or the

carrier's misrepresentation of the applicable rate is no defense to collection of the filed rate.  *Id.*

The doctrine applies regardless of the carrier or customer's intentions and despite possible

inequitable results.  *Id.* at 488-89.  Customers are conclusively presumed to have knowledge of

the filed tariff.  *Id.* at 489.

Moreover, "[r]ates…do not exist in isolation. They have meaning only when one knows the services to which they are attached. Any claim for excessive rates can be couched as a claim for inadequate services and vice versa." *Central Office*, 524 U.S. at 223. "Discriminatory 'privileges' come in many guises, and are not limited to discounted rates." *Id.* at 224. "Faster, guaranteed provisioning of orders for the same rate is certainly a privilege within the meaning of …the filed-rate doctrine." *Id.* at 225.

Further, the filed-rate doctrine bars a tort claim "wholly derivative of [a] contract claim for additional and better services." *Id.* at 226. A claimant "can no more obtain unlawful preferences under the cloak of a tort claim than it can by contract." *Id.* at 227. Rights under the tariff cannot be varied or enlarged by either contract or tort of the carrier. *Id.*; *Fax*, 138 F.3d at 488. An award of damages "would violate the filed rate doctrine by in effect providing a disguised retroactive rate adjustment…and by placing our…courts in the business of determining a reasonable level of service for matters subject to FCC regulation." *Duggal v. G.E. Capital Commc'ns Servs.*, 81 Cal. App. 4th 81, 91 (Cal. Ct. App. 2000). Thus, the filed-rate doctrine precludes damages for failure to provide services timely or to bill timely and accurately if the promises made by the carrier as to provisioning and billing are inconsistent with the filed tariff. *Id.*

The savings clause of the Communications Act[6] "preserves only those rights that are not inconsistent with the statutory filed-tariff requirements." *Central Office*, 524 U.S. at 227. In

---

[6] The savings clause of the Communications Act provides the following:

> Nothing in this Act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this Act are in addition to such remedies.

47 U.S.C. § 414 (2000).

other words, the filed-rate doctrine does not apply to state law claims that do not implicate the terms of a filed tariff. *Id.* at 229-230 (Rehnquist, C.J., concurring).

**Application to the Instant Proceeding**

Germane to this proceeding are the Tariff Governing WorldCom's International Telecommunications Services ("Tariff 1") and the Tariff Governing WorldCom's Domestic Telecommunications Services ("Tariff 2") (collectively "the Tariffs"). Plaintiff's Motion for Judgment on the Pleadings and Memorandum in Support, Ex. F, G.

Resellers and end users are all bound by tariff terms. *Duggal*, 81 Cal. App. 4th at 93. Moreover, Tariff 1 defines a customer as "any person, firm, corporation, or other entity which orders service from and is responsible for compliance with the regulations of and the payment of charges to [WorldCom]." Tariff 1 ¶ 2.8; *see also* Tariff 2 ¶ A. As WorldCom's reseller, CNI did order service from and was responsible for compliance with the regulations of and the payment of charges to WorldCom. Thus, the Court finds that CNI, as a reseller, is subject to the tariffs.

The filed rate-doctrine bars all but CNI's slamming and defamation claims. The Court turns first to CNI's contract claims. CNI alleges that WorldCom failed to keep its promise to provision customers no more than 14 days after a service request. CNI's Answer and Counterclaims, Count III. The Tariffs provide that "[a]ll service is subject to the availability of suitable facilities. [WorldCom] reserves the right to limit the length of communications or to discontinue furnishing service when necessary because of the lack of satellite or other transmission medium capacity or because of any causes beyond its control." Tariff 1 ¶ 2.1.2(A), *see also* Tariff 2 ¶¶ B.2.1.1 and B.5.1. This language goes against the promise of provisioning customers within a determined time frame. More importantly, such a promise constitutes

12

preferential treatment typically targeted by the filed-rate doctrine.  *Central Office*, 524 U.S. at 225.

CNI also blames WorldCom for overcharging, failure to give promised discounts, improper billing and refusal to let CNI implement a federal law requiring WorldCom's name to be included on bills sent to CNI customers.  CNI's Answer and Counterclaims, Counts IV, V.  Again, tariff terms control regardless of WorldCom's promises that may be inconsistent with them.  *Duggal*, 81 Cal. App. 4th at 91.  CNI cannot enforce discounts promised outside the Tariffs.  *Fax*, 138 F.3d at 488.  Nor did the Tariffs contain any provision entitling CNI to include WorldCom's name on bills sent to CNI's customers.  CNI does not say which federal law required WorldCom to allow its name to be included on bills sent to CNI customers.  Furthermore, Tariff 2 provides that the customer, CNI, is liable for all obligations under the Tariff even if the customer resells services to others and that WorldCom has no liability to anyone other than the customer.  Tariff 2 ¶ B.2.1.4.

The Court turns to CNI's tort claims.  CNI alleges that WorldCom's misrepresentations fraudulently induced CNI to enter into an alleged agreement.  CNI's Answer and Counterclaims, Counts I, II.[7]  WorldCom's misrepresentations are nothing more than promises regarding the business relationship between WorldCom and CNI.  They are "wholly derivative" of CNI's contract claims.  *Central Office*, 524 U.S. at 226.  WorldCom's alleged statements, which promised that (a) CNI would be a reseller and agent for WorldCom, (b) CNI could use WorldCom's tariffs in all of the 50 states, (c) WorldCom could provision CNI's customers in all 50 states, and (d) CNI could have the same arrangement on services and certifications that it had

---

[7] Count I, "Fraud in the Inducement," and Count II, "Tort of Intentional Nondisclosure," are substantially identical.

with Network Long Distance, are all promises not included in the Tariffs. Therefore, CNI's tort claims that are derivative of its contract claims are barred by the filed-rate doctrine. *Id*.

Furthermore, clauses in tariffs can limit the carrier's liability. *Duggal*, 81 Cal. App. 4th at 94. The Tariffs limit WorldCom's liability with the following language: "Except as stated in this Section 2.1.3, [WorldCom] shall have no liability for damages of any kind arising out of or related to events, acts, rights or privileges contemplated in this tariff. This tariff does not limit the liability of [WorldCom] for willful misconduct." Tariff 1 ¶ 2.1.3(A).

The apparent absence of limitation on WorldCom's liability for willful misconduct must be interpreted within the background of the whole tariff language. "[This provision] removes only those limitations upon liability imposed *by the tariff*, not those imposed by law. It is the Communications Act that renders the promise of preferences unenforceable. The tariff can no more exempt the broken promise of preference that is willful than it can the broken promise of preference that is unintentional." *Central Office*, 524 U.S. at 228.

Other tariff provisions further limit WorldCom's liability including the following: "The liability of [WorldCom] for damages resulting in whole or part from or arising in connection with the furnishing of services under this tariff, including but not limited to mistakes, omissions, interruptions, delays, errors or other defects or representations shall not exceed an amount equal to five times the initial minute charge provided for under this tariff for the period during which the international long distance call was affected. No other liability in any event shall attach to [WorldCom]." Tariff 1 ¶ 2.1.3(B); *see also* Tariff 2 ¶ B.5.8.

CNI asks for lost revenues, lost profits and consequential damages. CNI's Answer and Counterclaims ¶¶ 19, 21, 25, 28, 31, 34, 36, 46, 50. CNI also requests punitive damages. CNI's Answer and Counterclaims, Count VIII. Consequential and punitive damages are precluded by

the following tariff provision: "[WorldCom] shall not be liable for any direct, indirect, consequential, special, actual, or punitive damages, or for any lost profits of any kind or nature whatsoever arising out of any defects or any other cause. This warranty and these remedies are exclusive and in lieu of all other warranties or remedies, whether express, implied or statutory, including without limitation implied warranties or merchantability and fitness for a particular purpose." Tariff 1 ¶ 2.1.3(F); Tariff 2 ¶ B.5.6.

In sum, CNI's contract claims and tort claims based on WorldCom's alleged misrepresentations are within the ambit of the Tariffs and therefore precluded by the filed-rate doctrine.

**Effect of the Written Agreements**

Even if most of CNI's claims were consistent with the Tariffs and permitted under the filed-rate doctrine, the parties' written agreements, first the Intelenet Agreement and later the WorldCom Rebiller Service Agreement, supersede any alleged oral agreement.

CNI argues that the Intelenet Agreement did not deal with reselling issues. Its integration clause, however, provides that the Agreement "constitutes the full understanding of the parties and supersedes any prior agreements between the parties relating to local and long distance telecommunications services." Intelenet Agreement ¶ II. The Agreement refers to the Tariffs, id. ¶ I, which allow resale of services. Tariff 2 ¶ B.2.1.4.

CNI cannot consider the Rebiller Agreement unenforceable by arguing that a copy signed by both parties was delivered to CNI after expiration of the offer period. CNI was the first party to sign the contract and then forwarded it to WorldCom for signature. WorldCom did sign the Rebiller Agreement. Moreover, about two months later, both parties executed an amendment to the Rebiller Agreement. Both agreements have integration clauses superseding any prior

15

agreement.  Intelenet Agreement ¶ II; Rebiller Agreement ¶ 15.12.  The Court therefore

concludes that the written agreements of the parties superseded any alleged oral agreement.

Both agreements refer to the Tariffs.  Intelenet Agreement ¶ I; Rebiller Agreement ¶¶ 1.1

and 3.1.  The Rebiller Agreement excludes any promise of provisioning within a determined time

frame.  Rebiller Agreement ¶ 6.6.  A clause also contains significant limitations on WorldCom's

liability.  Id. ¶ 9.1.  CNI is prohibited from using WorldCom's name without WorldCom's

authorization and "solely responsible" for billing CNI's customers.  Id. ¶¶ 7.4 and 13.1.

CNI points to a fax from WorldCom that said WorldCom was "tariffed in all 50 states for

the Intelenet program," which would allow CNI "to add all physical locations in the United

States under [CNI's] umbrella."  Defendant's Memorandum of Law in Opposition to Plaintiff's

Motion for Judgment on the Pleadings, Ex. A.  This fax does not say more than the Tariffs and

does not add anything to the written agreements, which only say that WorldCom will provide

services pursuant to the applicable federal and state tariffs.  Rebiller Agreement ¶ 1.1; Intelenet

Agreement ¶ I.  WorldCom admitted telling Vermont state officials that CNI was not allowed to

utilize WorldCom's tariffs.  Plaintiff's Answer and Affirmative Defenses to Counterclaim ¶ 13.

This admission and the apparent contradiction with other representations that WorldCom made

to CNI do not alter the ultimate authority of the Tariffs and the written agreements.

Finally, both agreements determine rates and services without referring to CNI's previous

relationship with Network Long Distance.  *See, e.g.,* Intelenet Agreement ¶ II; Rebiller

Agreement ¶ 3.

In short, the parties' written agreements further undermine the validity of CNI's contract

and derivative tort claims.

*Improper Termination of Service and Slamming*

16

CNI reproaches WorldCom with unjustifiably cutting off services to CNI customers and slamming them. CNI's Answer and Counterclaims, Count VI. Besides, "CNI believes that after turning off services to CNI's customers, WorldCom slammed CNI customers and in doing so, used CNI's information about the customers." Id. ¶ 44. CNI notes that in June 2000 WorldCom paid $3.5 million to settle a charge of slamming by the FCC.

The Court must distinguish between the claim of improper termination of services and the slamming claim. As to the first one, the Tariffs and the written agreements of the parties provide that WorldCom can terminate services to its customer after notice in case of nonpayment. Tariff 1 ¶ 2.6.2; Tariff 2 ¶ B.7.1.1; Rebiller Agreement ¶ 10.3 and 10.4. CNI admits failing to make certain payments to WorldCom. Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings 5. Therefore, WorldCom could end the relationship with CNI for nonpayment.

Turning then to the slamming claim, the Court takes note that the majority decision in *Central Office* addressed tort claims "wholly derivative" of the contract claims and decided there was no evidence of tortious conduct giving rise to claims not preempted by the applicable tariffs. Justice Rehnquist, however, said that the tariff "does not affect whatever duties state law might impose on [a common carrier] to refrain from intentionally interfering with [a reseller's] relationships with its customers by means other than failing to honor unenforceable side agreements…. *Central Office*, 524 U.S. at 230 (Rehnquist, C.J., concurring); *In re MCI WorldCom, Inc.*, No. 6331, 2000 WL 668491, at *15 (Vt. Pub. Serv. Bd. Apr. 20, 2000). Justice Stevens, in his dissent, thought that part of the evidence available to the Court pertained to tort claims not derivative of the contract claims. *Id.* at 231 (Stevens, J., dissenting). Specifically, he noted that "[s]lamming was clearly a part of the case." *Id*. This observation, coupled with a jury

finding of willful conduct on the part of the common carrier, led him to conclude that the

slamming tort claims were not precluded by the tariffs. *Id.* at 232-233. Justice Stevens further

explained "[t]o the extent [the] tort claim is based on …slamming practices, it neither challenges

the carrier's filed rates, …nor seeks a special service or privilege…." *Id.* at 233. Therefore, he

concluded, the savings clause applied and the slamming claim was not preempted. *Id.* at 233-

234.

     The majority opinion did not expressly refute the substance of the dissent because in

*Central Office* the parties had not made an issue of the evidence relied upon by Justice Stevens.

*Id.* at 226 n.2. The question remains open whether a majority of the United States Supreme

Court would follow Justice Stevens's reasoning if a slamming claim were properly at issue.

     In the instant case, the tariff provisions expressly preserve WorldCom's liability for

willful conduct. Tariff 1 ¶ 2.1.3(A). CNI, however, has merely stated that WorldCom engaged

in slamming practices without alleging supporting facts. WorldCom's settlement with the FCC

does not prove WorldCom's actual practices toward CNI. Mere conclusory allegations fail to

state a claim and must therefore be dismissed.

### *Defamation Claim*

     CNI claims that WorldCom's "conduct including slamming customers, shutting off

customers, making untrue reports to Dun & Bradstreet, and the illegal refusal to release 800

numbers to CNI customers, all damaged CNI's business reputation and name." CNI's Answer

and Counterclaims, Count VII.

     The filed-rate doctrine does not preclude CNI's defamation claim because "[t]he tariff

does not govern…the entirety of the relationship between the common carrier and its customers.

For example, it does not affect whatever duties state law might impose…to refrain from

engaging in slander or libel….” *Central Office*, 524 U.S. at 230 (Rehnquist, C.J., concurring).

      WorldCom asserts that the Pennsylvania statute of limitations applicable to a defamation

action bars CNI’s claim. CNI has not contested that Pennsylvania law applies. If the parties’

pleadings assume that the law of a particular state governs the dispute, “such implied consent…is

sufficient to establish choice of law.” *IBM v. Liberty Mut. Fire Ins. Co.*, 303 F.3d 419, 423 (2d

Cir. 2002).

      Pennsylvania prescribes a one-year limitation for defamation suits. 42 Pa. Cons. Stat. §

5523(1) (2005). This limitation also applies to commercial disparagement cases. *Pro Golf Mfg.*

*v. Tribune Review Newspaper Co.*, 570 Pa. 242, 247 (Pa. 2002). The statute begins to run when

the cause of action accrues, which for defamation is the date of publication of the defamatory

statements. *Kilian v. Stackpole Sons, Inc.*, 98 F. Supp. 500, 504 (M.D. Pa 1951). The so-called

“discovery rule” would trigger the running of the statute when the plaintiff has discovered the

injury or, in exercise of reasonable diligence, should have discovered the injury. Some decisions

seem to support the application of the discovery rule to defamation actions under Pennsylvania

law. *Giusto v. Ashland Chem. Co.*, 994 F. Supp. 587 (E.D. Pa. 1998); *DiNicola v. DiPaolo*, 945

F. Supp. 848 (W.D. Pa. 1996); *Gallucci v. Phillips & Jacobs, Inc.*, 418 Pa. Super. 306, *appeal

denied*, 533 Pa. 660 (1993). A later decision, however, distinguished them to refuse to apply the

discovery rule to defamation actions. *Barrett v. Catacombs Press*, 64 F. Supp. 2d 440, 444 (E.D.

Pa. 1999). The *Barrett* court declined “to follow a rule that has not actually been applied

previously in the defamation context, absent clear statutory authority.” *Id.* at 445. The court

noted “the very essence of the discovery rule in Pennsylvania is that it applies only to those

situations where the nature of the injury itself is such that no amount of vigilance will enable the

19

plaintiff to detect an injury." *Id.* at 445 (*citing Dalrymple v. Brown*, 549 Pa. 217, 228-229).

Therefore, "the discovery rule should not be applied where…a defendant's alleged defamation

was not done in a manner meant to conceal the subject matter of the defamation." *Id.* at 446.

CNI does not allege that WorldCom's conduct was surreptitious. Consequently, the

controlling date for accrual of the cause of action is the date of publication of the defamatory

statements. *Easton v. Bristol-Myers Squibb Co.*, 289 F. Supp. 2d 604, 613 (E.D. Pa. 2003)

(citing *Barrett*); *Morris v. Hoffa*, No. 01-3420, 2002 U.S. Dist. LEXIS 5975, at *7; 169

L.L.R.M. (BNA) 3082 (E.D. Pa. Apr. 8, 2002) (same).

CNI filed its counterclaim alleging defamation in the United States District Court for the

Eastern District of Pennsylvania on April 3, 2001. Therefore, the statute of limitations bars the

claim if the publication of the defamatory statements occurred before April 3, 2000. CNI alleges

that "[i]n mid-1999, WorldCom, without the required notice to customers, shut off services to

CNI's customers for alleged non-payment by CNI." CNI's Answer and Counterclaims, ¶ 40.

CNI also claims that this conduct constitutes defamation because of its impact on CNI's

reputation. Therefore, the statute of limitations began to run at the latest in mid-1999 and CNI's

claim was stale by mid-2000. CNI's defamation claim is time-barred.

The Court also notes that to make a *prima facie* case of commercial disparagement a

plaintiff must prove that (1) the statement is false, (2) the publisher either intends the publication

to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary

loss, (3) pecuniary loss does in fact result, and (4) the publisher either knows that the statement

is false or acts in reckless disregard of is truth or falsity. *Pro Golf Mfg.*, 570 Pa. at 246. CNI has

not identified the contents of any specific actionable statement and refers to WorldCom's

20

conduct that amounts to defamation according to CNI.  Even if CNI's defamation claim is not

time-barred, its failure to identify the disputed statements makes it deficient as a matter of law.

### Motion to File Nunc Pro Tunc Responses to the Complaint

In the Pennsylvania Action or in this Court, CNI did not answer to the negotiable

instrument, *quantum meruit* and unjust enrichment counts of WorldCom's complaint.

WorldCom moved for judgment on the pleadings on these counts.  CNI admits it "mistakenly"

failed to answer.  Defendant's Motion to File Responses *Nunc Pro Tunc* to Certain Paragraphs of

the Complaint ¶ 2.  CNI is now requesting the Court to allow CNI to file responses *nunc pro tunc*

under Federal Rule of Civil Procedure 15, applicable to this proceeding through Federal Rule of

Bankruptcy Procedure 7015.

After a responsive pleading has been filed, a party may amend the pleading only with

leave of court or written consent of the adverse party.  Fed. R. Civ. P. 15(a).  WorldCom has not

consented to an amendment of the pleadings.  Plaintiff's Memorandum in Opposition to

Defendant's Motion to File Responses *Nunc Pro Tunc* to Certain Paragraphs of the Complaint.

The Court should freely grant leave to amend when justice requires, absent a substantial reason

to deny.  Fed. R. Civ. P. 15(a); *Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 234 (2d

Cir. 1995).  The decision is within the Court's discretion, but the Court should remember that

rule 15 aims at facilitating a decision on the merits.  *Filmtec Corp. v. Hydranautics*, 67 F.3d 931,

935 (Fed. Cir. 1995), *cert. denied*, 117 S. Ct. 62 (1996).

The following factors should be considered: bad faith of the moving party, prejudice to

the opposing party, undue delay, and futility of the proposed amendment.  *Foman v. Davis*, 371

U.S. 178, 182 (1962).  Delay alone usually does not warrant a denial of leave to amend.

*Rachman Bag Co.*, 46 F.3d at 234-235.  When applying these factors, the Court should draw

inferences in favor of granting the motion to amend. *Griggs v. Pace American Group, Inc.*¸ 170 F.3d 877, 880 (9th Cir. 1999). "[T]he liberal ethos of amendment means that the party opposing amendment bears a burden of production to come forward with reasons or evidence to deny leave to amend." 3 James Wm. Moore et al., *Moore's Federal Practice*, § 15.15[2] (3d ed. 1997). The burden would then shift "to the movant to come forward with reasons justifying an especially lengthy delay in moving to amend." *Id.*

CNI failed to file an answer to WorldCom's negotiable instrument, *quantum meruit*, and unjust enrichment claims both in the Pennsylvania Action and in this Court. WorldCom asserts that "CNI has offered no reason why it should be granted…relief." Plaintiff's Memorandum in Opposition to Defendant's Motion to File Responses *Nunc Pro Tunc* to Certain Paragraphs of the Complaint 3. WorldCom itself, however, should come forward with a justification for denial of leave to amend and has failed to do so.

There is no evidence of CNI's bad faith explaining its failure to amend the pleadings earlier. If leave to amend is granted, WorldCom would have to litigate further its own negotiable instrument, *quantum meruit*, and unjust enrichment claims without having to conduct its case in a significantly different way. Thus, WorldCom would not be significantly prejudiced. Moreover, the instant proceeding would not be unduly delayed by leave to amend because discovery in this adversary proceeding has not been completed. The Court also notes how the referral of the parties' case to the FCC and the interruption of the case by WorldCom's bankruptcy proceedings contributed to the length of the process.

Therefore, the Court grants CNI leave to amend the pleadings. The amendment will relate back to the date of CNI's original pleading in the instant adversary proceeding, namely CNI's Answer of Communications Network International, Ltd., with Affirmative Defenses to

Both Claim Objection and Adversary Proceeding, because the amendment has the same factual

and evidentiary bases as the original pleading, viz. the history of the business relationship and

litigation between WorldCom and CNI.  Fed. R. Civ. P. 15(c)(2); *Newman v. Kruszynski (In re*

*Kruszynski)*, 150 B.R. 209, 211 (Bankr. N.D. Ill. 1993).

## CONCLUSION

MCI's Motion for Judgment on the Pleadings is granted in that CNI's claims for fraud in

the inducement, intentional nondisclosure, breach of contract, defamation, and punitive damages

are dismissed.  MCI's motion is denied as to CNI's liability for unpaid services.  CNI's Motion

to File Responses *Nunc Pro Tunc* to Certain Paragraphs of the Complaint is granted.  CNI's

Cross-Motion for Judgment on the Pleadings is denied.

Counsel for MCI is to settle an order consistent with the Court's Opinion.

Dated: New York, New York
       March 13, 2006

                                                    *s/Arthur J. Gonzalez*
                                              UNITED STATES BANKRUPTCY JUDGE