UNITED STATES BANKRUPTCY COURT      For Publication
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| WORLDCOM, INC., *et al.*, | : | Case No. 02-13533 (AJG) |
| | : | (Confirmed Cases) |
| Debtors. | : | |
| | : | |

-------------------------------------------------------------x

| | | |
|---|---|---|
| | : | |
| MCI WORLDCOM COMMUNICATIONS, INC., | : | |
| f/k/a WORLDCOM TECHNOLOGIES, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adv. Proc. No. 04-04338 (AJG) |
| | : | |
| COMMUNICATIONS NETWORK | : | |
| INTERNATIONAL, LTD., | : | |
| | : | |
| Defendant. | : | |

-------------------------------------------------------------x

## OPINION, AFTER TRIAL, REGARDING WORLDCOM'S MOTION *IN LIMINE* AND REQUEST FOR DAMAGES

A P P E A R A N C E S

STINSON MORRISON HECKER LLP
Attorneys for Plaintiff
1201 Walnut Street
Kansas City, MO 64106

Mark A. Shaiken, Esq.
Of Counsel

FLAMM, BOROFF & BACINE, P.C.
Attorneys for Defendant
794 Penllyn Pike
Blue Bell, PA 19422

W. Mark Mullineaux, Esq.
Of Counsel

ARTHUR J. GONZALEZ
United States Bankruptcy Judge

## I.   INTRODUCTION

This opinion discusses the Court's findings following the damages trial of

WorldCom Communications, Inc. and its subsidiaries' (the "Debtors" or "WorldCom")

and Communications Network International, Ltd.'s ("CNI"), as well as WorldCom's

motion *in limine*.  The procedural background is explained fully below, but, in brief, CNI

filed a timely proof of claim against the Debtors, alleging that WorldCom improperly

billed CNI by (i) failing to provide certain rebates, (ii) failing to reimburse CNI for

switching telephone numbers, and (iii) by charging CNI taxes.  WorldCom subsequently

initiated an adversary proceeding against CNI, objecting to the proof of claim and

asserting that CNI failed to pay for services it provided to CNI under the relevant tariffs

(the Interstate Domestic Telecommunications Services Tariff (the "Domestic Tariff")

and the International Message Telecommunications Services Tariff (the "International

Tariff"), together, the "Tariffs") and the parties' contract[1] that, combined, governed their

relationship.

After multiple pre-trial motions and several opinions by the Court, the dispute

proceeded to trial.  Prior to trial and subsequent to the parties' submission of their Joint

Pre-Trial Order, WorldCom filed a motion *in limine* seeking to exclude CNI's evidence

in support of any contention previously rejected by the Court.

In support of its motion *in limine*, WorldCom argues that the Court has already

ruled on certain "issues" in prior rulings, such as whether WorldCom can charge for

---

[1] The parties' contract states that the contract is a Mississippi contract and is governed by Mississippi law.
(Damages Trial Ex. WC-2 ¶ 15.3, Feb. 19, 2008.)

"Unused Minimums," and whether CNI is owed $120,000 in promised credits.[2]

Therefore, WorldCom argues that the *law of the case* doctrine precludes CNI from re-

litigating issues that the Court has already decided.  CNI argues that the evidence would

be presented only to refute WorldCom's proof of damages.

Regarding the issue of damages, WorldCom argues that CNI owes it $480,030.45

for actual charges plus interest and attorneys' fees.  CNI argues that WorldCom's

business books and records are inaccurate and WorldCom actually owes it $98,484[3] once

the proper credits are applied.

Having reviewed the parties' pleadings and exhibits, and having held a trial on

February 19, 2008, the Court grants WorldCom's motion *in limine* to the limited extent

that evidence of promised credits and the alleged written agreement that CNI entered into

with Bruce Donohue, a sales manager of WorldCom (the "Donohue Agreement"), are

precluded by the Court's prior rulings that the filed-rate doctrine precludes CNI from

enforcing discounts outside of the Tariffs.  Further, WorldCom is awarded $478,588.51

in actual damages plus interest under the Tariffs to the date of judgment and is entitled to

attorney fees in the amount of $174,718.70 on behalf of work performed by Stinson

Morrison Hecker LLP ("Stinson").  The Court denies WorldCom's request for attorney

---

[2] In the Court's ruling on WorldCom's summary judgment motion, the Court found, as WorldCom properly cites, that "CNI's claims that some of the charges were made past the termination date of the Rebiller Agreement . . . are not supported by the evidence submitted."  *See MCI WorldCom Commc'ns, Inc. v. Commc'ns Network Int'l, Ltd.* (*In re WorldCom, Inc.*), No. 02-13533 (AJG), Adv. Proc. No. 04-04338 (AJG), 2007 WL 1989262, at *9 (Bankr. S.D.N.Y. July 9, 2007).  In light of the evidence submitted during trial as to the instant matter, the Court now finds that some of the charges ("Unused Minimum") were made past the termination date of the Rebiller Agreement.  However, those charges that were made subsequent to the termination date were proper and provided for under the Rebiller Agreement.  *See* discussion *infra* Part IV.B.3.

[3] CNI still maintains that it is owed substantial amounts that were previously set forth in its proof of claim, which the Court has already dismissed on the pleadings.  *See MCI WorldCom Commc'ns, Inc. v. Commc'ns Network Int'l, Ltd.* (*In re WorldCom, Inc.*), No. 02-13533 (AJG), Adv. Proc. No. 04-04338 (AJG), 2006 WL 693370, at **1-3, 12 (Bankr. S.D.N.Y. Mar. 13, 2006), *leave to appeal denied*, 358 B.R. 76 (S.D.N.Y. Dec. 6, 2006).

fees on behalf of work performed by Buchanan Ingersoll & Rooney, P.C. ("Buchanan") due to its failure to properly support the request. WorldCom must resubmit its request for attorneys' fees for work performed by Buchanan with the proper documentation by May 7, 2008. The Court schedules a hearing for May 14, 2008 to reconsider WorldCom's request as to Buchanan attorney fees, provided supporting documentation is submitted.

## II.    JURISDICTION

The Court has subject matter jurisdiction over this proceeding under sections 157 and 1334 of title 28 of the United States Code and under the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.). This matter is a core proceeding under section 157 of title 28 of the United States Code. Venue is proper before the Court under sections 1408 and 1409 of title 28 of the United States Code.

## III.    BACKGROUND

### A.  Background Information About the Debtors

Debtors provided a broad range of communications services in over 200 countries on six continents. Through their core communications service business, which included voice, data, internet, and international services, the Debtors carried more data over their networks than any other telecommunications entity. The Debtors were the second largest carrier of consumer and small business long distance telecommunications services in the United States and provided a wide range of retail and wholesale communications services.

On July 21, 2002 and November 8, 2002, the Debtors commenced cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). By orders

dated July 22, 2002 and November 12, 2002, the Debtors' chapter 11 cases were consolidated for procedural purposes only and were jointly administered.

On October 29, 2002, the Court entered an order establishing January 23, 2003 as the deadline for the filing of proofs of claim against the Debtors. On October 31, 2003, the Court entered an order confirming the Debtors' Modified Second Amended Joint Plan of Reorganization (the "Plan"). The Plan became effective on April 20, 2004 (the "Effective Date"). Upon the Effective Date, WorldCom changed its name to MCI, Inc. On January 6, 2006, Verizon Communications, Inc. and MCI, Inc. merged. MCI, LLC is now doing business as Verizon Business Global, LLC.

### B.   Business Relationship Between WorldCom and CNI

The background information about WorldCom and its business relationship and litigation with CNI are set out in detail in the Court's earlier opinion. *See In re WorldCom,* 2006 WL 693370, at **1-3.

In brief, CNI resells telecommunications services from common carriers like WorldCom to its own customers. In December 1997, WorldCom and CNI entered into a written agreement, the "Intelenet Agreement," which, according to CNI, WorldCom eventually deemed inappropriate for the parties' relationship. In November 1998, CNI provided WorldCom with a copy of the WorldCom Rebiller[4] Service Agreement (the "Rebiller Agreement") that was signed only by CNI. On January 29, 1999, WorldCom gave a copy of the Rebiller Agreement signed by both parties to CNI. On that same day, CNI signed an amendment to the Rebiller Agreement and WorldCom signed it on February 4, 1999. WorldCom invoiced CNI monthly for services provided pursuant to the Rebiller Agreement.

---

[4] As used herein, the terms "rebiller" and "reseller" are synonymous.

### C.  Procedural History

The procedural history regarding the instant matter is set out in detail in the Court's earlier opinions.  *See In re WorldCom,* 2007 WL 1989262, at **1-2; *MCI WorldCom Commc'ns, Inc. v. Commc'ns Network Int'l, Ltd.* (*In re WorldCom, Inc.*), 378 B.R. 745, 748-750 (S.D.N.Y. Dec. 7, 2007).

In brief, on January 22, 2003, CNI filed a timely proof of claim of $17,701,534, which was assigned claim number 22183, arguing that WorldCom improperly billed CNI by (i) failing to provide certain rebates, (ii) failing to reimburse CNI for switching telephone numbers, and (iii) by charging CNI taxes.  CNI asserts that WorldCom overcharged it for usage and improperly charged it for non-usage related charges (PIC-C charges).  (Answer and Counterclaims  ¶¶  26-28.)   Further, CNI contends that if WorldCom properly credited and charged CNI's account, WorldCom actually owes CNI money.  (Answer and Counterclaims  ¶  40.)

On October 12, 2004, WorldCom initiated an adversary proceeding against CNI, objecting to the proof of claim and asserting that CNI failed to timely pay the balance due on the account and did not make any payments after April 1999.  (Compl.  ¶¶  7-18.)

On October 22, 2004, CNI filed an answer.

On February 22, 2005, WorldCom moved for judgment on the pleadings seeking dismissal of all the claims in CNI's proof of claim.  WorldCom also moved for judgment on the issue of CNI's liability regarding its claims based on negotiable instrument, *quantum meruit*, and unjust enrichment, all of which CNI had failed to answer.

On March 2, 2005, CNI moved to file responses *nunc pro tunc* to the negotiable instrument, *quantum meruit*, and unjust enrichment counts of the complaint.

On March 4, 2005, CNI cross-moved for judgment on the pleadings.

On March 7, 2005, CNI filed a response to WorldCom's motion for judgment on the pleadings asserting that its claims are not barred by the filed-rate doctrine.

On March 14, 2005, WorldCom filed responses to CNI's motion to file responses *nunc pro tunc* to certain paragraphs in the complaint and to CNI's cross-motion for judgment on the pleadings.

On March 18, 2005, CNI filed a reply to WorldCom's responses.

On March 21, 2005, WorldCom filed a reply to CNI's response to its motion for judgment on the pleadings.

On April 5, 2005, CNI filed a sur-reply to WorldCom's reply to its motion for judgment on the pleadings.

On April 12, 2005, WorldCom filed a sur-reply to CNI's reply to its motion for judgment on the pleadings.

On March 13, 2006, the Court granted WorldCom's motion for judgment on the pleadings dismissing CNI's claims in its proof of claim. *See In re WorldCom,* 2006 WL 693370, at *12. WorldCom's motion was denied, however, as to CNI's liability for unpaid services. *See id.* The Court also granted CNI's motion to file responses *nunc pro tunc* to WorldCom's negotiable instrument, *quantum meruit*, and unjust enrichment claims and denied CNI's cross-motion for judgment on the pleadings. *Id.* In that opinion, the Court stated that the parties' written agreements superseded any alleged oral agreement and that CNI cannot enforce discounts promised outside of the filed tariff. *Id.* at **7-8.

On April 26, 2006, CNI filed an amended answer.

On May 1, 2006, CNI filed a motion for leave to appeal.  That motion was denied on December 6, 2006 by the United States District Court for the Southern District of New York.

On January 15, 2007, WorldCom filed a summary judgment motion asserting that it is entitled to summary judgment as a matter of law because the Court has already dismissed CNI's claims, and, therefore, CNI does not have any defense as a result of the Court's previous ruling rejecting CNI's argument that the parties' relationship is not governed by the Rebiller Agreement because of an alleged verbal agreement or because the Rebiller Agreement is unenforceable.

On February 14, 2007, CNI filed a response, annexing a declaration of Mr. Curtis Cooke ("Cooke"), a previous general manager and current board member of CNI, to WorldCom's motion for summary judgment arguing that it did not breach the Rebiller Agreement and that WorldCom's chart reflecting what CNI owed WorldCom is inaccurate and contains "doctored" entries.  Further, CNI argues that the Donohue Agreement provides that as of March 1, 1999, after CNI pays $66,398.45 to WorldCom, its balance would be $0.00.  The Donohue Agreement also stated that WorldCom would provide CNI certain credits on its April 1999 bill.

On February 28, 2007, WorldCom filed a sur-reply to CNI's response.

On March 5, 2007, CNI filed a motion for leave to file a sur-sur-reply memorandum to WorldCom's sur-reply contemporaneously with a Second Declaration of Cooke.

On July 9, 2007, the Court granted CNI's motion for leave to file a sur-sur-reply memorandum in part, only to the extent that it addressed WorldCom's contention

regarding CNI's failure to timely dispute its charges, and denied CNI's motion in part regarding any remaining issues. On the same day, the Court granted WorldCom's summary judgment motion in part as to the issue of CNI's breach of the Rebiller Agreement and denied the summary judgment motion in part on the grounds that there is a genuine issue of material fact regarding WorldCom's claim for damages. *See In re WorldCom,* 2007 WL 1989262.

On February 11, 2008, WorldCom and CNI submitted their Joint Pre-Trial Order.

On February 13, 2008, WorldCom filed a motion *in limine* to exclude CNI's evidence in support of any contention previously rejected by the Court.

On February 15, 2008, CNI filed a response to WorldCom's motion *in limine*.

On February 19, 2008, a hearing was held before the Court regarding the motion *in limine* and the issue of damages.

## IV.    DISCUSSION

### A.  Motion *in limine*

Prior to trial, WorldCom filed a motion *in limine* seeking to exclude evidence in support of any contention previously rejected by the Court, including that

- WorldCom "doctored" an entry on the chart summarizing the CNI invoices
- CNI should not have to pay "Other Charges"
- WorldCom cannot charge for "Unused Minimums"
- WorldCom cannot charge CNI for "Finance Charges"
- CNI is owed $120,000 in promised credits
- WorldCom cannot charge CNI for "Taxes."

WorldCom argued that the Court has already ruled on these "issues" in prior rulings, and seeks, via the motion *in limine*, to preclude CNI under the law of the case doctrine from re-litigating issues the Court has already decided.

Under the law of the case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Pescatore v. Pan American World Airways, Inc.*, 97 F.3d 1, 7-8 (2d Cir. 1996) (internal quotation omitted); *see also Liona Corp. v. PCH Assoc. (In re PCH Assoc.)*, 949 F.2d 585, 592 (2d Cir. 1991) ("Under the law of the case doctrine, a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation."). "While the doctrine is ordinarily applied in later stages of the same lawsuit, it also has application to different lawsuits between the same parties." *Id.*

"The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence." *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 140 (S.D.N.Y. 2003); *see also United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 164 (S.D.N.Y. 2006) ("A motion *in limine* allows the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence."). A court considering a motion *in limine* may reserve judgment until trial in order to place the motion in the appropriate context, and may alter course as the case proceeds, depending on the actual evidence presented. *See id.* at 165. The practice of *in limine* motions has developed pursuant to the district court's "inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) ("Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials.").

A review of the procedural background will help place the motion in context. On July 9, 2007, the Court granted WorldCom's motion for summary judgment, finding that CNI was liable under the contract but requiring further fact-finding on the issue of damages. Specifically, the

10

Court found that CNI breached the Rebiller Agreement.  The Court also summarized a prior ruling by stating that the Court has already ruled on certain issues and has found that "regardless of any inconsistent promises made by WorldCom, the filed-rate doctrine and the controlling terms of the [Tariffs] prohibited CNI from enforcing discounts promised outside of the Tariffs." *In re WorldCom*, 2007 WL 1989262, at *8.  The March 13, 2006 Opinion stated that the "filed rate doctrine precludes damages for failure to provide services timely or to bill timely and accurately if the promises made by the carrier as to provisioning and billing are inconsistent with the filed tariff." *In re WorldCom*, 2006 WL 693370, at *6.  The Court has also ruled that the filed-rate doctrine renders moot CNI's complaints that WorldCom overcharged it, failed to give promised discounts, and that "[c]onsideration of the Donohue Agreement is precluded by the Tariffs and therefore . . . has no other basis to support its defense against WorldCom's breach claim." *In re WorldCom*, 2007 WL 1989262, at *8.  The Court also stated that the filed-rate doctrine precludes adjudication of claims about credit disputes or discounts. *Id*. at *9.  The Court did find, however, that WorldCom had not conclusively established damages. *Id.*

CNI countered WorldCom's request to exclude certain evidence by arguing that its evidence would be presented only to refute WorldCom's proof of damages.  CNI states that the Court, in the July 9, 2007 Opinion, found that "a reasonable fact finder 'could find that [WorldCom's damages] chart reflects an amount in excess of WorldCom's damages.'"  (Resp. Mot. *in Limine* 2 (citation omitted).)  CNI denies that it owes the following items: (i) "Other Charges," (ii) "Unused Minimum," (iii) "Finance Charges," and (iv) "Taxes."

At the commencement of the trial, the Court heard the evidence, subject to a later ruling on the motion *in limine*, in part, because CNI stated that its evidence was not voluminous.  CNI asserted that it was entitled to defend as to "which items are OK [from WorldCom's damages

chart] and which items are wrong," (Damages Trial Tr. 8:11-13, Feb. 19, 2008), and that under the Rebiller Agreement, WorldCom incorrectly accounted for the transactions.  (*Id.* at 12:13-17.) In fact, contrary to the concerns expressed by WorldCom in its motion *in limine*, CNI introduced very little evidence to re-litigate already decided issues; CNI's evidence was, indeed, not voluminous.

CNI did, however, attempt to submit as evidence the Donohue Agreement, to which WorldCom objected, (*id.* at 72:2-21), and evidence that CNI did not receive certain credits.  (*Id.* at 44:24-45:17.)

CNI explained that it was trying to use the Donohue Agreement to show that there were "discrepancies" in WorldCom's books and billings, and that the spreadsheet prepared by WorldCom to show its damages was not "accurate."  (*Id.* at 73:10-18.)  The Court expressed skepticism of CNI's argument, stating that CNI's counsel was "drawing a distinction where [the Court is] not so sure there is a difference," (*id.* at 73:24-25), but, nonetheless, allowed the questioning, subject to a later ruling on the motion *in limine*.  (*Id.* at 73:25-74:02.)  The subsequent questioning of CNI's witness, Cooke, however, did not relate to WorldCom's spreadsheet.  Cooke spoke mainly about discussions between Bruce Donohue and him that preceded the Donohue Agreement, as shown by this excerpt

> Q:    Now, did you have discussions with Mr. Donohue about this document?
> A:    Yes.
> Q:    What did he say?
> A:    Well, the top number, the $66,398.45 was the number that they [WorldCom] gave us for that month, just as they had given us numbers that varied from the bills month after month after month from the very start.  The agreement that we had with Bruce Donohue, and . . . Duane Jones . . . was that if we paid that, we would be current.  We would have no other balance except for future bills . . . .

(*Id.* at 75:2-18.)

As is obvious, the witness's testimony and CNI's use of the Donohue Agreement

at trial did not support the argument that the spreadsheet was inaccurate. Rather,

questions regarding the Donohue Agreement appeared to be an attempt to revive CNI's

previously rejected argument that the Donohue Agreement contained promises

inconsistent with the Tariffs, which was rejected by the Court in the July 9, 2007

Opinion –

> WorldCom claims that CNI breached the Rebiller Agreement by failing to make payments since April 1999. CNI disputes this allegation primarily by referring to the Donohue Agreement -- i.e., that it paid the requisite amount of $66,398.45 in order to bring its balance for that period to $0.00. CNI also argues that the Chart is plagued with incorrect charges, credits, and amounts, as well as doctored entries and substantial omissions.
>
> The Court has already ruled on certain of these issues in its earlier opinion. *See In re WorldCom, Inc.*, 2006 WL 693370, at *7 ("CNI also blames WorldCom for overcharging, failure to give promised discounts, improper billing . . . ."). The Court held that regardless of any inconsistent promises made by WorldCom, the filed-rate doctrine and the controlling terms of the Tariff Governing WorldCom's International Telecommunications Services and the Tariff Governing WorldCom's Domestic Telecommunications Services (collectively "the Tariffs") prohibited CNI from enforcing discounts promised outside of the Tariffs. *Id.* Thus, in this case, whether the check for $66,398.45 was withheld by CNI or returned by WorldCom's bank due to insufficient funds, or whether WorldCom breached the Donohue Agreement by refusing to pay the $120,000.00 credit to CNI is irrelevant. Consideration of the Donohue Agreement is precluded by the Tariffs and therefore has no bearing on this matter.

*In re WorldCom,* 2007 WL 1989262, at *8.

All evidence and testimony regarding any purported credit, including Cooke's

testimony about his conversations with Bruce Donohue that preceded the Donohue Agreement,

are precluded by the Court's prior rulings that the filed-rate doctrine precludes CNI from

enforcing discounts outside of the Tariffs. As such, the Court will not consider those portions of CNI's exhibits D3, D4, D7, and D8 or Cooke's testimony that contain evidence of purported credits or discounts that are outside of the Tariffs.[5]

Also, regarding the other evidence or arguments of CNI that WorldCom sought to preclude,[6] the Court finds that CNI is entitled to respond to WorldCom's proof of damages. Granting WorldCom's motion *in limine* in its entirety would unfairly deprive CNI of that ability. Further, at trial, CNI did not introduce evidence on those items but responded, if at all, on cross-examination to WorldCom's evidence and witness.

For the above stated reasons, the Court grants WorldCom's motion *in limine* to the limited extent that evidence of promised credits and the Donohue Agreement is precluded.

### B. Damages

WorldCom argues that CNI owes it $480,030.45 in actual damages plus interest, totaling $2,116,675.15, and attorneys' fees in the amount of $177,223.25 for work performed by Stinson and $136,821.77 for work performed by Buchanan[7] for breaching the Rebiller Agreement, totaling $2,430,720.17.[8]  (Trial Tr. 38:10-15, 39:22-40:3, Ex. WC-5.)  At trial, Allison testified as to how she created the "CNI Spreadsheet" (the

---

[5] CNI's exhibit D15 will not be considered for several reasons. For one, one purpose of CNI's cross-examination of Ms. Sondra Allison ("Allison"), a consultant in the Credit and Collections Department of Verizon, regarding the document (*see* Trial Tr. 53:15-21) seems intended to show that the parties had made an agreement on credits that was inconsistent with the Tariffs, an issue that, as discussed above, is settled under the law of the case doctrine. Also, WorldCom's counsel objected that the exhibit was not listed in the pre-trial order. CNI counsel's response that he did not have to list the document in the pre-trial order because he was only using it to impeach the witness on cross-examination is flawed. The statement was not a "prior inconsistent statement" of Allison under Federal Rule of Evidence 613, as someone else created the document.

[6] *See* CNI's arguments *supra* pp. 9-10 (that CNI should not have to pay "Other Charges" and that WorldCom cannot charge for "Unused Minimums," "Finance Charges," and "Taxes").

[7] On April 15, 2008, WorldCom, through Stinson, submitted a motion seeking to revise the amount sought for work performed by Buchanan from 152,108.46 to $136,821.77. On April 29, 2008, the parties submitted a stipulation consenting to the relief sought. An order was entered on April 30, 2008 approving the stipulation.

[8] As a result, the new total changed from $2,446,006.86 to $2,430,720.17. *See id.*

"Spreadsheet"), including the accompanying "Other Charges" and "Interest Calculation"

charts, which provide a fairly detailed description of how WorldCom determined that

CNI owes $2,116,675.15, not including attorneys' fees for breaching the Rebiller

Agreement.  Allison states

> I reviewed all of the invoices that were sent by WorldCom to CNI, and
> then I checked each invoice to determine the amount owing.  I prepared
> a detailed [S]preadsheet of what the ["O]ther [C]harges["] were. There
> was an "[O]ther [C]harges" category on the invoices of what comprised
> those ["O]ther [C]harges["], and there was a prior summary spreadsheet
> that was prepared by WorldCom prior to my involvement.  I reviewed
> that and then made adjustments based on the invoices, after my review
> of the invoices, to accurately reflect what was on the invoices.  I also
> reviewed the contracts and tariffs to determine the interest amount that
> was allowed for any unpaid balances, and then I calculated the interest.

(Trial Tr. 16:14-25.)  Allison explained that all of the columns in the Spreadsheet

correspond to a charge category on the invoice and likewise, all of the charges or credits

set forth in the Spreadsheet correspond to a charge or credit in one of the invoices

reviewed.  (Trial Tr. 22:4-13.)  Allison also explained that the charges set forth in the

"Other Charges" chart correspond to a separate entry on the invoice that had an "Other

Charges" category delineating that charge.  (Trial Tr. 23:5-13.)

When Allison was questioned about the differences between the Spreadsheet and

the one previously submitted to the Court, Allison stated:  "The changes I made were just

to accurately reflect what the invoices showed.  The bottom line did change by the

amount that [WorldCom] reduced for not asking for the July 1999 and after invoices."

(Trial Tr. 43:16-17, 43:21-22.)  Allison further stated:  "My task was to review the

invoices and to make sure and create the [S]preadsheet based on what the invoices

reflected."  When queried:  "If there was any agreement between CNI and WorldCom

beyond the invoices, that was not within the scope of your job?" Allison responded:

"That is correct." (Trial Tr. 44:16-22.)  And when queried: "Did you become aware of the fact that WorldCom and CNI had agreed that the amounts in [the "Payment"] column were the actual bill amounts?" Allison responded:  "The amounts in the "[P]ayment["] column are payments that were reflected on the invoices.  Again, my only function was to review the invoices and make sure this [S]preadsheet properly reflected any charges or credits given." (Trial Tr. 53:15-21.)

CNI argues otherwise.  CNI contends that WorldCom owes it $98,484 after the Spreadsheet is adjusted to remove overbilled charges and to reflect the credits owed to CNI.  (Pre-Trial Order 4-7.)  According to Cooke, the invoiced amount does not accurately reflect what CNI actually owes.  Cooke asserts that CNI met monthly with WorldCom's sales team to determine how much CNI owed WorldCom.  CNI states once an amount was determined, CNI paid that amount, as evidenced by column "K," titled "Payment" in the Spreadsheet.  CNI contends that the payment amounts listed in column "K" is evidence of what CNI actually owed at the time of payment.  (Trial Tr. 60:14-18, 64:21-65:6.)  Thus, CNI disputes WorldCom's charges as to "Other Charges," "Taxes," "Unused Minimums," "Finance Charge," and "Interest" and contends that WorldCom owes it certain credits.

### 1. *Other Charges*

### a. PIC Charges[9] and Credits

---

[9] The Rebiller Agreement defines the acronym "PIC" as primary interexchange carrier.  (Trial Ex. WC-2 ¶¶ 6.3, 7.1; *see also* Tr. 69:3-4.)  The Federal Communications Commission describes "PIC Charges," presubscribed interexchange carrier (long distance carrier) charge, as a long distance fee that companies pay to incumbent local telephone companies to recover part of the cost for providing the facilities that link each telephone customer to the telephone network.  FCC Consumer Facts—Presubscribed Interexchange Carrier Charge, http://www.fcc.gov/cgb/consumerfacts/PICCchanges.html.  "PIC change charges" are "federally-tariffed charges imposed by local exchange carriers on end user subscribers when these subscribers change their presubscribed interexchange carriers."  *Presubscribed Interexchange Carrier Charges*, CC Docket No. 02-03, 20 FCC Rcd. 16,320 (2005).

The "Other Charges" chart indicates that CNI owes WorldCom $136,368.12 in "PIC Charges" and $15,960 in "PIC Code Change Charges." (Trial Ex. WC-5 at 2.) WorldCom's basis for assessing these charges is the Tariffs. WorldCom asserts that "the [T]ariffs contained provisions relating to rates, charges, and taxes. They included numerous tables and lists of rates and charges . . . ." As such, WorldCom argues that the Tariffs and not an alleged oral agreement determined the charges for telecommunications services WorldCom provided to CNI, thus, CNI's assertions are barred by the filed-rate doctrine. (Pl.'s Mot. J. Pleadings 11.) Further, WorldCom argues that the parties' written contracts superceded any alleged oral agreement as both contracts contained integration clauses stating that the contract supercedes any prior agreements between the parties. (*Id*. at 16-17.)

As to the "PIC Charges," CNI argues that it does not owe WorldCom any money. (Trial Tr. 68:8-10.) Prior to trial, CNI argued that WorldCom allegedly violated an oral agreement by failing to reimburse it for "switching telephone numbers (PIC charges)," and that WorldCom "failed to follow the proper billing of CNI's customers." (Counterclaim ¶¶ 26-28; Def.'s Mem. Law Opp'n Pl.'s Mot. J. Pleadings 16.) In response to WorldCom's contention that CNI's claims are barred by the filed-rate doctrine, CNI stated, "In short, this is not a case about WorldCom's rates or about WorldCom's tariff. Rather, it is a case about WorldCom's unfair business practices." (Def.'s Mem. Law Opp'n Pl.'s Mot. J. Pleadings 18.) Therefore, CNI argued the filed-rate doctrine did not apply. As to the parties' written agreements, CNI argued that the Intelenet agreement was inapplicable and the Rebiller Agreement was unenforceable. (*Id*. at 18-20.)

At trial, CNI specifically argued that it allegedly discussed the "PIC Charges," which "were staggered based on the kind of telephone line involved," with WorldCom's sales team after it received the first invoice because WorldCom improperly charged its customers at the business level as opposed to the residential level. CNI states that "a business paid $2.75 a month . . . a residential customer paid . . . $0.57 a month, and . . . there was a different charge for multiple lines." (Trial Tr. 67:1-10.) Further, CNI asserts that WorldCom allegedly orally promised that it would ensure that CNI's residential customers would be billed at the residential level and that it would "fix" how CNI was billed for the "PIC Charges." CNI states that when the billing company processed the PIC charges and sent it "to companies like Verizon, they charged CNI per line, a charge for each line on the bill." Consequently, CNI asserts that when it credited a customer's bill, that credit created another charge on the bill. (Trial Tr. 67:17-25.)

Regarding the "PIC Code Change Charge," which is the cost of switching carriers, CNI argued prior to trial that WorldCom allegedly violated an oral agreement and the Intelenet agreement by overcharging for "non-usage related charges (PIC-C charges)" and that WorldCom "failed to follow the proper billing of CNI's customers." (Counterclaim ¶¶ 26-28; Def.'s Mem. Law Opp'n Pl.'s Mot. J. Pleadings 16.) As to these charges, CNI also asserted "this is not a case about WorldCom's rates or about WorldCom's tariff. Rather, it is a case about WorldCom's unfair business practices," (Def.'s Mem. Law Opp'n Pl.'s Mot. J. Pleadings 18.), therefore, CNI argued that the filed-rate doctrine did not apply. CNI also argued that the parties' written agreements were inapplicable. (*Id*. at 18-20.)

At trial, Cooke specifically asserted that WorldCom "had [allegedly] agreed with [CNI] that if [CNI] switched [its] customers over and added new customers and so on, [CNI's] customers would be . . . credit[ed]. So there would be no cost to them to . . . change [carriers]." (Trial Tr. 62:9-17.) Cooke further stated that CNI "put [a] credit on the first bill that each customer received to reimburse them for that, and [WorldCom's] sales team had [allegedly] agreed that they would get reimbursed for that and it would be adjusted on [CNI's] billing." (Trial Tr. 62:17-21.)

Based upon that alleged oral agreement, CNI argues that WorldCom should have credited its account in an amount over $200,000 because CNI submitted over 20,000 customers to WorldCom at a $10 credit per person or telephone number. CNI states that WorldCom owes it approximately $170,000 in "PIC Credits." (Trial Tr. 61:17-62:6, 62:22-25, 63:6-14.) For example, CNI asserts that WorldCom did not credit its account in the amount of $50,000 for the additional 5,500 to 6,000 customers CNI submitted to WorldCom. In support, CNI points to exhibit D8, an e-mail from Erica Chaplin ("Chaplin") of WorldCom dated May 27, 1998, where Chaplin mentioned credits in the amount of $6,840 for "pic [sic] charges on your ani's[10] [sic]" and a credit in the amount of $50,000 "for ani's [sic] that we are installing for all," both of which had "to be approved by management." (Trial Tr. 70:17-71:12, Ex. D8.) In addition, Cooke asserted that WorldCom credited its account three times in the amount of $15,960 for some of the customers CNI submitted to WorldCom, implying that the credits indicate that it was overcharged,[11] but argues that one of those credits was "reversed,"[12] as evidenced by the

---

[10] The acronym ANI means automatic number identification. (Trial Ex. WC-2 ¶ 6.3.)

[11] CNI states that it disputed the charges on every invoice including the very first one and engaged in lengthy negotiations over the credits due and account balance as evidenced by exhibits D3, D4, D5, D6, and D7. (CNI's Sur-Reply Mem. Opp'n WorldCom's Mot. Summ. J. 4.)

outstanding "PIC Code Change Charge" balance, essentially arguing that it is currently

owed a credit in the amount of $15,960.  (Trial Tr. 68:22-69:12, Ex. D4; *see also* Tr.

71:9-11.)

In response, Allison asserts that none of the credits listed in Chaplin's email were

listed on any of the invoices she reviewed "so they are not reflected on the [S]preadsheet

that I created."  (Trial Tr. 45:8-10.)

CNI's assertions lack merit.  First, any alleged oral agreement is of no effect

because of the Tariffs.  The Domestic Tariff obligates CNI to pay PIC charges

> The Company [WorldCom] shall be appointed agent for Customer [CNI]
> to arrange interconnection from the Company's point of presence to
> Customer's facilities (Local Access), and Customer shall be responsible
> for payment of Local Access charges for such interconnections secured
> on the Customer's behalf unless service does not necessitate the securing
> of Local Access or Custom[er] specifically requests that the Company
> not arrange interconnection (in which case interconnection shall be the
> sole responsibility of the Customer). The rates charged for Local Access
> service shall be subject to change in the event of a rate adjustment by the
> local telephone company or other third party utilized by the Company in
> arranging Local Access.

(Trial Ex. WC-4 ¶ B.4.2.)  It further states, "[t]he Customer is also liable for any

cancellation/disconnection charges assessed by the interconnecting telephone company

for the provision of dedicated Local Access."  (*Id*. at ¶ B.4.3.)  Additionally, the

Domestic Tariff obligates CNI to pay non-recurring charges.  (*Id*. at ¶ D.6.2.1.)  "Non-

recurring charges are non-usage sensitive and apply for each feature component used in

the Customized 800 Service.  Non-recurring charges are the costs associated with

installing combinations of features for a single 800 number."  (*Id*. at ¶ ¶ D.6.3.4 (A),

D.7.10.7.)  "Non-recurring charges include Service Ordering/Installation Charges and

---

[12] The Spreadsheet reflects three credits under "PIC Credits" in the amount of $15,960 prior to May 1999.
The Spreadsheet also reflects a $15,960 charge under "Other Charges" on May 6, 1999, probably the
"reversal" Cooke referenced at trial.  (Trial Tr. 69:2-6.)

Connection Charges. These Charges are applied on a one-time basis per 800 number and per 800 feature."[13] (*Id.* at ¶ D.6.2.1.(A).)

Accordingly, to the extent that CNI's assertions challenge the rates set forth in the Tariffs and seek purported credits, those assertions, as stated above on page 14, have been excluded by the Court's partial granting of WorldCom's motion *in limine*. Thus, CNI's assertions and exhibits D3, D4, and D8 regarding purported credits for "PIC Charges" and "PIC Code Change Charges" are precluded from consideration by the Court's prior rulings that the filed-rate doctrine precludes CNI from enforcing discounts outside of the Tariffs.

Second, the parties' written agreement obligates CNI as well. The Rebiller Agreement, which incorporates the terms of the Tariffs (Trial Ex. WC-2 ¶ 1.1), provides that

> Customer [CNI] agrees that it is responsible for (i) all charges incurred by WorldCom to change the PIC of End Users to the WorldCom network, (ii) all charges incurred by WorldCom to change End Users back to their previous PIC arising from disputed transfers to the WorldCom network . . . . WorldCom will have no obligation to resolve a dispute involving PIC Charge.

(*Id.* at ¶ 5.1) and that "WorldCom will bill Customer [CNI] for the Service, PIC Charges and other amounts on a monthly basis." (*Id.* at ¶ 5.2.) The Rebiller Agreement further states that "[t]his Agreement contains the full understanding of the Parties and supercedes any prior agreements between the Parties." (*Id.* at ¶ 5.2.)

---

[13] The sample January 2,1999 invoice categorizes "PIC Charges" as "Non-Recurring Charges." (Trial Ex. WC-9.) The Rebiller Agreement states that CNI had WorldOne Option A, 24-Month ESP Service. (Trial Ex. WC-2 ¶ 1.1.) The "WorldOne Service offers a unified service for single or multi-location customers using switched, dedicated, and OnLine calling card origination and switched or dedicated 800 (in WATS) termination. The WorldOne package includes the availability of outbound, inbound (800) with peak and off peak rates . . . ." (Trial Ex. WC-4 ¶ C.3.4.13.1.) The WorldOne service plan under the Domestic Tariff states that "[t]he Non-recurring charges that apply to WorldOne Service are found in Section D.6.2 and D.6.3 – 800 Service Charge." (Trial Ex. WC-4 ¶ D.7.10.7.)

Accordingly, to the extent that CNI does not dispute WorldCom's rates as set forth in the Tariffs, but rather argues that WorldCom improperly classified its customers thereby resulting in WorldCom improperly billing CNI for PIC charges, under the Rebiller Agreement, that contention qualifies as a "dispute involving a PIC Charge" that WorldCom has no obligation to resolve.  Nonetheless, CNI asserts that WorldCom allegedly orally agreed to "fix" how CNI was billed after it brought the billing dispute to WorldCom's attention upon receiving its first invoice, therefore, CNI contends that it does not owe WorldCom any money based upon that alleged oral agreement.  (Trial Tr. 67:17-25.)

Any of CNI's defenses premised upon an alleged oral agreement prior to the Rebiller Agreement fails since the Court has already concluded "that the written agreements [the Intelenet and Rebiller Agreement] of the parties superceded any alleged oral agreement" because both agreements have integration clauses.  *In re WorldCom,* 2006 WL 693370, at *8; (*see also* Trial Ex. WC-1 ¶ II, Ex. WC-2 ¶ 15.12.)  Likewise, any of CNI's defenses premised upon an alleged oral agreement subsequent to the Rebiller Agreement (for example, WorldCom's alleged oral promise to "fix" CNI's billing thereby crediting CNI's account for any overcharges) lacks merit.  The Rebiller Agreement clearly and unambiguously states:  "This Agreement may be modified only pursuant to a writing that is signed by each of the Parties."  (Trial Ex. WC-2 ¶ 15.7.)  An alleged oral agreement does not constitute a modification under the contract nor does the five attachments to Cooke's second declaration (submitted in opposition to WorldCom's motion for summary judgment) corresponding to CNI's exhibits D3, D4, D5, D6, and D7, respectively, submitted at the damages trial discussing, including but not limited to, PIC-

C charge credits already posted, PIC charge credits pending "corporate approval," and account balances.[14]  As such, CNI has failed to submit any proof evidencing a written modification between the parties warranting the Court to look beyond the "four corners" of the document to determine the parties' intentions.

Accordingly, CNI is liable for all PIC charges incurred by WorldCom pursuant to the Tariffs and the Rebiller Agreement.  Moreover, the Court finds that Allison credibly testified as to how she created the Spreadsheet, ensuring that the charges set forth in the Spreadsheet are delineated in the monthly invoices thereby accurately reflecting what CNI owes.  Other than the precluded evidence, CNI has failed to proffer any evidence demonstrating that the amounts due as set forth in the Spreadsheet are inaccurate.

The Court accordingly finds that WorldCom is entitled to $136,368.12 in damages for "PIC Charges" and $15,960 in damages for "PIC Code Change Charges," and CNI is not entitled to any other PIC credits other than those already posted to its account.

### b. Debit-Promotional Credit

According to the Spreadsheet, CNI owes WorldCom $2,000 for "Debit-Promotional Credits." (Trial Ex. WC-5 at 2.)

CNI asserts that as a result for attending WorldCom's Expo in Philadelphia as a customer, WorldCom credited its account in the amount of $2,000, but argues that the

---

[14] The Court has previously ruled that these five attachments that CNI submitted as evidence that it timely disputed the invoice charges "deal with credit disputes similar to the ones raised in CNI's counterclaim which the Court dismissed in its earlier opinion.  As mentioned previously, the filed rate doctrine precludes adjudication of such claims by the Court."  The Court did not address whether CNI timely disputed the invoice charges consistent with the Rebiller Agreement. *In re WorldCom,* 2007 WL 1989262, at *9.  CNI only submitted D3, D4, D5, and D7 as evidence at trial, and further those exhibits are precluded from consideration by the filed-rate doctrine to the extent the exhibits contain evidence of purported credits or discounts that are outside the Tariffs. *See supra* Part IV.A.  Additionally, those documents are also precluded from consideration to the extent they discuss PIC charges and credits as they do not constitute evidence of a written modification under the Rebiller Agreement.

$2,000 credit it received for attending the expo was subsequently "taken away" by

WorldCom.[15]  In support, CNI points to Chaplin's email discussing a $2,000 credit.

(Trial Tr. 68:11-18, 70:17-25, Ex. D8.)

In response, Allison asserts that the $2,000 credit was "not listed on the

spreadsheet or listed on the invoices, so [it is] not reflected on the [S]preadsheet that I

created."  (Trial Tr. 44:24-45:10.)

The Domestic Tariff obligates CNI to repay any promotional fees.  "A customer

[,(CNI), with the WorldOne ESP service,] who cancels their agreement prior to the

expiration of the term will be required to repay any promotional credits that were given in

addition to other termination charges . . . ."  (Trial Ex. WC-4 ¶ C.3.4.13.2(E).)  Since the

Court has already found that CNI breached the Rebiller Agreement, which incorporates

the terms of the Tariffs, CNI is liable for these charges.  Further, as previously stated,

CNI's exhibit D8, which discusses a $2,000 credit, is precluded by the Court's prior

rulings that the filed-rate doctrine precludes CNI from enforcing discounts outside of the

Tariffs.  Therefore, any alleged oral agreement is of no consequence and precluded.

Accordingly, WorldCom is entitled to $2,000 in damages for "Debit-Promotional

Credit."

### 2. Taxes

According to the Spreadsheet, CNI owes WorldCom $24,513.54 in "Taxes."

(Trial Ex. WC-5.)

---

[15] When Cooke was queried as to the "Debit-Promotional Credit" charge, Cooke responded by discussing
WorldCom's expo in Philadelphia (Trial Tr. 68:11-18) and when questioned about alleged promised credits
in exhibit D8, Cooke responded:  "The $2,000 credit going back nine years . . . It may have been the
promotional credit we just talked about or something else."  (Trial Tr. 70:17-25.)

CNI, in the Pre-Trial Order, claims that the parties never agreed that CNI would pay taxes. (Pre-Trial Order 7; *see also* Tr. 64:2-3.) At trial, CNI advanced another argument, alleging that WorldCom overbilled it by approximately $17,000 and as a result, WorldCom improperly assessed finance charges on the entire invoice because it included the overcharged amount and "taxes that were later reversed off." (Trial Tr. 64:5-10.) CNI contends that as a rebiller, it never collected the taxes directly or paid it directly. CNI states that the U.S. Billing Company in San Antonio, Texas collected the taxes through local carriers like Verizon and paid it directly to the appropriate agency. Further, CNI contends that WorldCom allegedly orally agreed that CNI would not be charged taxes as evidenced by the $7,600.34 tax credit it received. (Trial Tr. 63:23-64:5, Ex. WC-5.)

CNI's defenses fail. First, any alleged oral agreement is of no effect because of the Tariffs, as discussed. Second, contrary to CNI's assertions in the Pre-Trial Order, the International Tariff states that the Customer (CNI) is responsible for "Federal, state and local sales, use and excise" taxes. (Trial Ex. WC-3A ¶ 2.2.6.1(A).) "It shall be the responsibility of the Customer to pay these taxes and to accept the liability for any such unpaid taxes that become retroactively applicable." (*Id.*) The Domestic Tariff also obligates CNI to pay certain taxes. "Federal, state, or local use, and excise, gross receipt, sales or privilege taxes shall be paid by CNI." (Trial Ex. WC-4 ¶ B.8.1.)

CNI fails to identify any issue regarding the accuracy of the charges other than its previously mentioned contentions, which are precluded by the filed-rate doctrine. The amount WorldCom claims that CNI owes for taxes is an accurate representation of the owed amount. For example, the amount reflected in the sample invoice of January 2,

1999 (Trial Ex. WC-9) corresponds to the line item under the "Taxes" column for the

1/2/99 invoice date on the Spreadsheet (Trial Ex. WC-5.)

The Court accordingly finds that WorldCom is entitled to $24,531.54 in damages

for "Taxes."

### 3. Unused Minimum

WorldCom states that as of September 1999, CNI owes $239,260.37 in "Unused

Minimum" charges and asserts that amount is lower than the amount actually owed.

(Trial Tr. 33:13-20, 83:4-8, Ex. WC-5.)  Allison testified that she calculated the monthly

"Unused Minimum" amount by determining the "Usage Amount" per month as stated in

the invoices and then subtracting that number from $100,000 pursuant to the Rebiller

Agreement.  (Trial Tr. 33:5-12, 83:6-7, Ex. WC-5.)  Paragraph 4.2 of the Rebiller

Agreement states

> Customer [CNI] agrees to maintain at least **$100,000 in monthly
> revenue** for Service provided hereunder (**"Customer's Minimum
> Commitment"**).  In the event Customer does not maintain Customer's
> Minimum Commitment in the months indicated, then for those
> months(s) only, Customer will pay WorldCom the difference between
> Customer's Minimum Commitment and Customer's actual charges for
> the month(s) in question (**the "Deficiency Charge"**).  The Deficiency
> Charge will be due at the same time payment is due for Service provided
> to the Customer, or immediately in an amount equal to Customer's
> Minimum Commitment for the unexpired portion of the Term, if
> WorldCom terminates the Agreement based on Customer's default.

(Trial Ex. WC-2 (emphasis in original).)

Therefore, WorldCom argues that CNI agreed to the terms of the Rebiller

Agreement, essentially agreeing that it would be liable for the "Customer's Minimum

Commitment" if it did not meet its monthly minimum usage amount and if WorldCom

terminated the Rebiller Agreement due to CNI's default.  (Trial Tr. 82:23-83:4.)  The

Domestic Tariff also contemplates that CNI is liable for its monthly minimum commitment.  Paragraph C.3.4.13.1 states:  "[I]f the minimum [billing commitment] is not reached for Option A ESP[16] . . . the customer will be charged for the difference.  Customers much reach the minimum monthly usage requirement associated with their selected option by the fourth (4th) invoice period and monthly thereafter."  (Trial Ex. WC-3.)  Likewise, paragraph 3.3.1.1.(b)(A) of the International Tariff obligates CNI to fulfill its monthly minimum commitment by providing that customers have the option of committing "to a specific dollar volume of monthly minimum usage as described in the [Domestic Tariff]."  (Trial Ex. WC-4.)

In opposition, CNI states that WorldCom has not argued that CNI had fallen below its minimum usage during the period WorldCom provided CNI services.  (Br. Opp'n Mot. Summ. J. 6.)  CNI argues that since WorldCom wrongfully[17] terminated the contract, CNI "was unable to get any usage for [its] customers through [WorldCom], because [WorldCom] refused to do it and . . . [WorldCom] charge[d] [CNI] for something that [CNI was] prevented from using."  (Trial Tr. 65:15-20; *see also* Br. Opp'n Mot. Summ. J. 5; Pre-Trial Order 6; Cooke Decl. 4.)  CNI states that on June 7, 1999, WorldCom "blocked all of the lines that were associated with CNI so that [its] customers could not make long distance calls" and failed to notify the customer's of the impending termination.  (Trial Tr. 66:7-11.)  Therefore, CNI argues that once its customers could not use WorldCom's system to make calls, it was impossible for CNI to meet the usage

---

[16] The Rebiller Agreement states "WorldCom will provide its WorldOne Option A, 24-Month ESP Service to Customer [CNI] . . . ."  (Trial Ex. WC-2 ¶ 1.1.)
[17] In its brief, CNI stated:  "WorldCom wrongfully terminated any services to CNI and thus made performance impossible . . . ."  (Br. Opp'n Mot. Summ. J. 5.)

minimum set forth in the Rebiller Agreement.  (Trial Tr. 66:2-6, 66:15-18; *see also* Tr. 85:24-86:8.)

CNI's arguments in response to WorldCom's assertion that CNI is liable for the "Unused Minimum" charges are premised upon its contention that WorldCom's termination was wrongful and, therefore, WorldCom's actions prevented CNI customers from using WorldCom's services thereby making it impossible for CNI to meet its minimum usage amount.  Apparently, CNI does not dispute the interpretation of paragraph 4.2, but its applicability, arguing that paragraph 4.2 should not apply because the termination was wrongful.  CNI never addresses the enforceability of paragraph 4.2 in the event that the termination at issue was not wrongful.  It simply ignores the Court's prior ruling and argues against the "Unused Minimum" charges on the basis of a wrongful termination.   As the Court has already found that CNI defaulted and WorldCom's termination, based upon that default, was in accordance with the Rebiller Agreement, paragraph 4.2 applies.  Accordingly, CNI is liable for the "Unused Minimum" charges in accordance with paragraph 4.2 of the Rebiller Agreement.

As such, WorldCom is entitled to $239,260.37 in damages for "Unused Minimums."

### 4. Finance Charges

According to the Spreadsheet, CNI owes WorldCom $20,752.12 in "Finance Charges."  (Trial Ex. WC-5.)  CNI argues that the amount listed on the Spreadsheet is inaccurate because there were no late payments.  CNI asserts that if WorldCom had properly kept its business books and records, CNI's account balance would have been

current with no finance charges due.  (Trial Tr. 64:14-19; Br. Opp'n Mot. Summ. J. 6;

Pre-Trial Order 6-7.)

WorldCom has not explained what "Finance Charges" stem from, and unlike the

charges for taxes or interest, reference to the Tariffs or the Rebiller Agreement does not

provide any guidance, as neither the Tariffs nor the Rebiller Agreement expressly

provides for "Finance Charges."  At the trial, WorldCom's witness did not explain how

the $20,752.12 in finance charges was calculated.  Nothing in the representative invoice

indicates a charge for a "Finance Charge," although an amount of $2,543.49 was entered

under "Current Charges" for one account on the sample invoice of January 2, 1999 (Trial

Ex. WC-9) corresponding to the Spreadsheet's "Finance Charge" entry for January 2,

1999.  (Trial Ex. WC-5.)  More importantly, in the Memorandum of Law in Support of

Motion *in limine*, WorldCom equates "Finance Charges" with "Interest."  For example,

WorldCom asserts that it is entitled to "Finance Charges" because the invoices and

Tariffs provide for 1.5% interest on past due amounts.  (Mem. Supp. Mot. *in Limine* 8.)

WorldCom, however, also seeks recovery for interest.  *See infra* IV.B.5.

The Court finds that WorldCom is not entitled to recover any amount for

"Finance Charges" because WorldCom failed to establish that the Tariffs and Rebiller

Agreement provide for it and WorldCom did not otherwise provide evidentiary support

for it at trial.

### 5. Interest

According to the Spreadsheet, as of February 19, 2008, CNI owes WorldCom

$1,636,644.70 in interest.[18]  (Trial Ex. WC-5.)  Allison states that she calculated the

---

[18] Interest rate calculation: $2,116,675.15 (total amount due as of 02/19/08, including interest) –
$480,030.45 (account balance as of 10/01/99) = $1,636,644.70.  (Trial Ex. WC-5.)

interest as of November 1, 1999 because the "Unused Minimums" did not appear on

CNI's invoice until October 1, 1999 and CNI had until October 31, 1999 to pay that

invoice.  If CNI did not pay the invoice, interest would start to accrue on the past due

amount.  (Trial Tr. 37:15-38:15.)

WorldCom cites paragraph B.6.3 of the Domestic Tariff, which states "[a]ccounts

not paid within thirty (30) days from the due date stated on the bill will be considered

delinquent.  Delinquent payments may result in the imposition of a late fee at the rate of

one and one-half percent (1.5%) of the unpaid balance per month . . . ."  (Trial Tr. 35:16-

36:1, Ex. WC-4A.)  Also, paragraph 2.2.6.1(B) of the International Tariff obligates CNI

to pay interest by stating "[b]ills are due and payable upon receipt.  Interest at the lesser

of (1) the rate of one and one-half (1.5) percent per month . . . shall accrue upon any

unpaid balance commencing thirty (30) days after the date of the bill first sent for the

unpaid amount."  (Trial Tr. 36:2-11, Ex. WC-3A.)  Additionally, the monthly invoices

CNI received notified it that WorldCom would assess a 1.5% interest rate on past due

balances.  A sample invoice of January 2, 1999 states "[p]ast due portions of your total

amount due are subject to a monthly service charge of 1.500 percent."  Allison testified

that this language appeared on all the invoices that she reviewed.  (Trial Tr. 35:4-15, Ex.

WC-9.)

In opposition, CNI argues that the Rebiller Agreement precludes WorldCom from

assessing a 1.5% interest rate on past due, delinquent balances.  CNI contends that the

Rebiller Agreement provides for exclusive remedies and interest is not included in the

contract as a remedy.  Therefore, CNI asserts that since the Rebiller Agreement does not

provide for interest as a remedy, WorldCom cannot assess an interest charge on any of its past due, delinquent balances. (Trial Tr. 42:5-16, 85:1-15.)

In support, CNI cites paragraph 15.11 of the Rebiller Agreement stating "[e]xcept as otherwise specifically provided for herein, the remedies set forth in this Agreement comprise the exclusive remedies available to either Party at law or in equity" (Trial Tr. 42:5-16, Ex. WC-2) and paragraph 1.1 stating

> All of the terms and conditions of the Tariffs now or hereafter in effect are incorporated in this Agreement. In the event that any provision set forth in this Agreement conflicts with the terms and conditions of any of the Tariffs, the provision set forth in this Agreement will govern.

(Trial Tr. 57:20-23, Ex. WC-2.)

CNI's contention that interest is excluded as a remedy because it is not provided for as a remedy in the Rebiller Agreement is misguided. The Rebiller Agreement incorporates the terms of the Tariffs, which state that WorldCom may assess a 1.5% interest rate on past due, delinquent balances. Although the Rebiller Agreement does not have a corresponding provision, that does not mean that the Rebiller Agreement conflicts with the Tariffs. A conflict would have existed if the Rebiller Agreement had provided that WorldCom could not assess an interest rate on past due, delinquent balances or had provided for a different interest rate. In the instant case, the Court finds that a conflict does not exist and WorldCom may assess a 1.5% interest rate per month on any past due, delinquent balance as set forth in the Tariffs.

Accordingly, WorldCom is entitled to assess a 1.5% interest rate per month on past due balances. However, WorldCom must recalculate the amount of interest owed since the Court has denied some of WorldCom's request for damages.

### 7. Attorneys' Fees

WorldCom asserts that it is entitled to reasonable attorneys' fees and costs pursuant to the Rebiller Agreement in the amount of $177,223.25 for work performed by Stinson and $136,821.77 for work performed by Buchanan, totaling $314,045.02[19] in attorneys' fees and expenses. (Mot. Summ. J. 5; Mem. Supp. Summ. J. 6; Trial Ex. WC-10, Ex. WC-11A.)[20] CNI did not object to the specific amounts requested as attorneys' fees or dispute WorldCom's basis for recovering fees and costs. At trial, CNI's counsel only stated that it would be premature for the Court to award attorneys' fees at this juncture due to "the likelihood for this case, as I am sure you are aware, is that it is probably going to go up on appeal . . . ." (Trial Tr. 87:1-7.)

In support, WorldCom cites paragraph 15.10 of the Rebiller Agreement, which states "[i]n any action arising out of or relating to this Agreement, the prevailing Party will be entitled to recover its reasonable attorneys' fees and other costs in addition to any other relief that may be awarded." (Trial Tr. 38:18-24, Ex. WC-2.) The Tariffs also contemplate an award of attorneys' fees. Paragraph 2.2.6.1(B) of the International Tariff states "[i]f the Company [WorldCom] initiates legal proceedings to collect any amount due hereunder, and the Company subsequently prevails in such proceedings, then the defendant Customer [CNI] shall pay the reasonable attorney's fees and costs of the Company incurred in prosecuting such proceedings and any appeals therefrom." (Trial Tr. 38:25-39:7, Ex. WC-3A.) Paragraph B.6.5 of the Domestic Tariff states that "[i]n the

---

[19] The revised total for attorneys' fees for Stinson and Buchanan is $314,045.02 as opposed to $329,331.71.
[20] Mark Shaiken of Stinson submitted an affidavit in support of legal fees and expenses from September 2004 through January 2008 in the amount of $177,223.25 on behalf of WorldCom. (Trial Ex. WC-10.) Initially, Lawrence M. Farnese of Buchanan submitted an affidavit in support of legal fees and expenses through January 2008 in the amount of $152,108.46 on behalf of WorldCom. (Trial Ex. WC-11.) The revised amount is $136,821.77. (Trial Ex. WC-11A.) *See supra* note 7.

event the Company [WorldCom] incurs fees or expenses, including attorneys' fees, court

costs, cost of investigation and related expenses in collecting, or attempting to collect,

any charges owed the Company, the customer [CNI] will be liable to the Company for

the payment of all such fees and expenses reasonably incurred." (Trial Tr. 39:8-14, Ex.

WC-4A.)

The evaluation of reasonable attorneys' fees and the reduction of those fees are

within the sound discretion of the Court. *See ACE Ltd. v. CIGNA Corp.*, No. 00 CIV.

9423(WK), 2001 WL 1286247, at *2 (S.D.N.Y. Oct. 22, 2001). The applicant for

attorneys' fees "bears the burden of documenting the hours reasonably spent by counsel,

and the reasonableness of the hourly rates claimed." *Id.* "'[A] district court can exclude

excessive and unreasonable hours from its fee computation by making an across-the-

board reduction in the amount of hours.'" *Id.* (quoting *Luciano v. Olsten Corp.*, 109 F.3d

111, 117 (2d Cir. 1997)). It is within the Court's discretion to reduce an award of

attorneys' fees for "vagueness in the documentation of certain time entries." *See U.S.

Football League v. National Football League*, 887 F.2d 408, 415 (2d Cir. 1989). *See

also ACE Ltd.*, 2001 WL 1286247, at *2 ("The court may further reduce the fee request

where the fee applicant has failed to provide adequate information regarding the hourly

rate which was charged.").

Here, WorldCom has not provided, regarding Buchanan's fees, adequate

information regarding the hours attorneys have worked on the matter, or the services the

attorneys provided. For example, the billing statement contains only the amount of fees

and costs charged, and does not contain information about which attorneys worked on the

matter, what they did, or when they worked on the matter, aside from the general and

unhelpful statement applying to all entries that "[t]he fees, costs and expenses set forth on the attached Schedule I fall into the following categories: investigation; legal advice; drafting complaint, motions and discovery; participating in conferences and hearings; researching; and miscellaneous other matters." The Supplemental Affidavit of Lawrence Farnese, submitted on April 15, 2008, in support of the Motion to Substitute Amended WorldCom Trial Exhibit 11, does not cure the deficiencies as it does not contain information on the hours worked or services provided.

WorldCom has provided, regarding Stinson's fees, adequate information. That firm, however, has charged full travel time without submitting an affidavit stating that work was accomplished during travel. Regarding travel time fees, the case law is clear within the Second Circuit that courts regularly reduce attorneys' fees by fifty percent for travel time. *See Wise v. Kelly*, No. 05 Civ. 5442(SAS)(THK), 2008 WL 482399, at *14 (S.D.N.Y. Feb. 21, 2008); *see also In re Painewebber Ltd. P'ships Litig.*, No. 94 Civ. 8547 (SHS), 2003 WL 21787410, at *4 (S.D.N.Y. Aug. 4, 2003) ("[W]hen determining attorneys' fees, courts in the Southern District of New York generally do not credit travel time at the attorney's full hourly rate and customarily reduce the amount awarded for travel to at least 50% of that rate."); *Colbert v. Furumoto Realty, Inc.*, 144 F. Supp. 2d 251, 261 (S.D.N.Y. 2001) (explaining that travel time may be fully reimbursed if the moving party submitted an affidavit stating that work was accomplished during that time). As set forth in the accompanying footnote, WorldCom's fee award for work performed by Stinson has been reduced by $2,504.55.[21]

---

[21] (A) Dennis Cross, 03/21/05 travel to New York. Four hours. Cross's rate is $202.13 per hour and the fee will be reduced accordingly by $404.26. (B) Dennis Cross, 03/22/05 travel from New York. Four hours. Cross's rate is $202.13 per hour and the fee will be reduced accordingly by $404.26. (C) Dennis Cross, 03/05/07 travel to New York. Four hours. Cross's rate is $202.13 per hour and the fee will be

For the reasons set forth above, the Court finds that (1) WorldCom is entitled to an award of attorneys' fees and costs against CNI in the amount of $174,718.70 for work performed by Stinson; and (2) WorldCom is not entitled to any fees and costs for work performed by Buchanan. WorldCom must resubmit a properly supported request for attorneys' fees and costs on Buchanan's behalf containing, in affidavit form, an accounting of the specific tasks performed, an identification of which attorney performed the task and when, and the hours billed for those tasks along with the attorneys' rates by May 7, 2008. The Court will reconsider WorldCom's request as to Buchanan attorney fees at the hearing on May 14, 2008.

## V.    CONCLUSION

For the reasons set forth above, the Court (1) grants WorldCom's motion *in limine* to the limited extent that evidence regarding promised credits and the Donohue Agreement are precluded by the Court's prior rulings that the filed-rate doctrine precludes CNI from enforcing discounts outside of the Tariff, (2) awards WorldCom actual damages in the amount of $478,588.51,[22] (3) awards WorldCom interest (on the

---

reduced accordingly by $404.26. (D) Dennis Cross, 03/06/07 travel from New York. Four hours. Cross's rate is $202.13 per hour and the fee will be reduced accordingly by $404.26. (E) Mark Shaiken, 10/24/07 travel. 1.2 hours. Shaiken's rate is $229.19 and the fee will be reduced accordingly by $137.51. (F) Andrew W. Muller, 1/23/08 travel to Kansas City. Three hours. Muller's rate is $250 per hour and the fee will be reduced accordingly by $375. (G) Andrew W. Muller, 1/25/08 travel from Kansas City to Omaha. Three hours. Muller's rate is $250 per hour and the fee will be reduced accordingly by $375.

[22] WorldCom may charge CNI the following amounts: "Usage Amount," $570,317.36; "Direct Assist.," $11,502.89; "Pay Phone Charge," $991.58; "Other Charges," $160,447.91; "Taxes," $24,513.54; "Unused Minimum," $239,260.37; and "Finance Charge," $0 = $1,007,033.65. Applicable credits: "Payment," $454,955.85; "Rate Credit," $10,165.45; "Mo Serv Ch Credit," $7,615.25; "PIC Credit," $48,108.25; and "Tax Credit," $7,600.34 = $528,445.14. Total amount of actual damages is $478,588.51, not including interest to the date of judgment and attorneys' fees for work performed by Stinson.

   Allison credibly testified that she computed the "Other Charges" chart based upon the invoices that delineated an "Other Charges" category. Accordingly, the Court computed the damages based upon the number in the "Other Charges" chart as opposed to the amount indicated in the Spreadsheet and did not include the corresponding debit and credit that account for the difference. Also, the "Finance Charge" and its corresponding credits were not included in the damages calculation.

past due balance) to the date of judgment at a 1.5% rate per month, (4) awards

WorldCom attorneys' fees in the amount of $174,718.70 for work performed by Stinson,

and (3) denies WorldCom's request for attorneys' fees for work performed by Buchanan.

WorldCom must resubmit its request attorneys' fees and costs for work performed by

Buchanan with the proper documentation by May 7, 2008.  The Court will reconsider an

award of reasonable attorneys' fees at the hearing on May 14, 2008.

WorldCom is to settle an order consistent with this opinion.


Dated:   New York, New York
             April 30, 2008

**s/Arthur J. Gonzalez**
UNITED STATES BANKRUPTCY JUDGE